# Exhibit 5

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3

4     - - - - - - - - - - - - - - - x

                                    :

5     RENITA S. WALSTON-JACKSON,     :

                                    :

6                    Plaintiff,      :

                                    :

7       - vs -                       :    Civil Complaint

                                    :    No.1:06-cv-616-RCL

8     CCA OF TENNESSEE, INC.,        :

                                    :

9                    Defendant.      :

                                    :

10    - - - - - - - - - - - - - - - x

11

12                                   Washington, D.C.

13                                   January 11, 2008

14    Deposition of:

15                    RENITA S. WALSTON-JACKSON

16    a witness, was called for oral examination by counsel

17    for the Defendant, in the offices of Ford & Harrison,

18    1300 19th Street, Suite 700, Washington, D.C., 20036,

19    commencing at approximately 11:30 a.m., on Friday,

20    January 11, 2008, before Deborah L. Spear, a Notary

21    Public in and for the District of Columbia, when were

22    present on behalf of the respective parties:

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 2

1    APPEARANCE OF COUNSEL
2       On Behalf of the Plaintiff:
3       L. SAUNDRA WHITE, ATTORNEY
           White Bay & Henderson, LLC
4          1401 Mercantile Lane, Suite 200C
           Largo, MD 20774
5          (240) 455-6158
6       On Behalf of the Defendant:
7       ALISON NADINE DAVIS, ATTORNEY
           Ford & Harrison, LLP
8          1300 19th Street, N.W., Suite 700
           Washington, D.C. 20036
9          (202) 719-2000
10
11                *    *    *    *
12
13
14
15
16
17
18
19
20
21
22

Page 3

CONTENTS

1
2    Witness                                    Page
3    RENITA S. WALSTON-JACKSON
4       By Ms. Davis                              4
5
6    Jackson Exhibits              Marked
7    1   Notice of Deposition              4
8    2   Resumé                           12
9    3   Application for Employment       14
10   4   Superior Court Complaint         25
11   5   Response to 1st Set of Interrogatories   28
12   6   CCA form 3-19A, Uniform and Dress       56
13   7   CCA Policy 3-15, Drug and Alcohol       57
14   8   CCA Policy 3-17, Sexual Harassment      59
15   9   Exhibit A (written complaints)          79
16   9A  Incident Statement               85
17   10  Exhibit H (written statements)          107
18
19
20
21
22

Page 4

11:30  1              PROCEEDINGS
11:30  2    Whereupon,
11:30  3              RENITA S. WALSTON-JACKSON,
11:30  4    was called as a witness and, having first been duly
11:30  5    sworn by a Notary Public, was examined and testified
11:30  6    as follows:
11:30  7              (Deposition Exhibit Number 1
11:30  8               was marked for identification.)
11:30  9    EXAMINATION BY COUNSEL FOR DEFENDANT
11:30 10   BY MS. DAVIS:
11:30 11       Q    Good morning.  Do you go by Walston-Jackson
11:30 12   or Jackson?
11:30 13       A    Walston-Jackson.
11:30 14       Q    Good morning, Ms. Walston-Jackson.  I am
11:31 15   Alison Davis, and I am counsel for CCA of Tennessee,
11:31 16   Inc. who is the defendant in a lawsuit which you have
11:31 17   filed in the District of Columbia.  And I will be
11:31 18   asking you a series of questions today relating to the
11:31 19   complaint that you have filed.
11:31 20       A    (Witness nodded head affirmatively.)
11:31 21       Q    Now, before we get started I just want to go
11:31 22   over some of the rules, as I call them, of how this

Page 5

11:31  1    deposition will proceed.  I'm sure you have had
11:31  2    discussions with your attorney as to what to expect,
11:31  3    but just so you and I understand each other, I just
11:31  4    want to go over a few things before we get started.
11:31  5    First of all, we have a court reporter here who is
11:31  6    taking down all of the questions that I ask and also
11:31  7    she will take down all of your responses.
11:31  8       A    Okay.
11:31  9       Q    Therefore it's very important that you allow
11:31 10   me to finish my questions before you answer.  That way
11:31 11   she is able to get down the complete question.  And
11:31 12   also I will allow you to answer so she gets your
11:32 13   response accurately.
11:32 14       A    (Witness nodded head affirmatively.)
11:32 15       Q    It's also important that before you answer
11:32 16   my questions that you are comfortable that you
11:32 17   understand what I am asking.
11:32 18       A    Okay.
11:32 19       Q    Because any response that you give will be
11:32 20   part of the record and will be used going ahead in
11:32 21   this case.  So if at any time I ask you a question you
11:32 22   don't understand, please feel free to ask me to

DEBORAH L. SPEAR, COURT REPORTER
(301)843-9370 / (301)641-0556

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 6

11:32 1    restate the question or say I don't understand, and I
11:32 2    will do my best --
11:32 3        A    Okay.
11:32 4        Q    -- to state it in a way that will help
11:32 5    you --
11:32 6        A    Okay.
11:32 7        Q    -- to respond to the question.
11:32 8            We are allowed seven hours for your
11:32 9    deposition under the rules. So we may be here a
11:32 10   while. If you need to take a break, you need to go to
11:32 11   the ladies room, you found where it was when you came
11:32 12   in, if you need to get something to drink, please let
11:32 13   me know and we can take a break. I only ask that you
11:32 14   don't request a break while a question is pending. So
11:32 15   if I ask a question, please answer it, and then
11:32 16   request to take a break. Okay?
11:32 17       A    All right.
11:32 18       Q    All right, we will get started now.
11:33 19           Is there any reason why today you would not
11:33 20   be able to answer my questions honestly?
11:33 21       A    No.
11:33 22       Q    Are you on any type of medication?

Page 7

11:33 1        A    No.
11:33 2        Q    Anything that would affect your memory?
11:33 3        A    No.
11:33 4        Q    Or ability to understand?
11:33 5        A    (Witness shook head negatively.)
11:33 6        Q    Could you please restate your name for the
11:33 7    record?
11:33 8        A    Renita Walston Jackson.
11:33 9        Q    And how do you spell your first name?
11:33 10       A    R-E-N-I-T-A.
11:33 11       Q    And your last name?
11:33 12       A    Jackson, J-A-C-K-S-O-N.
11:33 13       Q    And how do you spell Walston?
11:33 14       A    Oh, W-A-L-S-T-O-N. I'm sorry.
11:33 15       Q    And where do you currently reside?
11:33 16       A    The address?
11:33 17       Q    Yes, the address.
11:33 18       A    3160 Guildcrest Court, Waldorf, Maryland
11:33 19   20602.
11:33 20       Q    And how long have you resided there?
11:33 21       A    Almost a year.
11:33 22       Q    And where did you live prior to Waldorf?

Page 8

11:33 1        A    Laurel, Maryland.
11:33 2        Q    And what was your address there?
11:33 3        A    9542 Muirkirk, M-U-I-R-K-I-R-K I think it
11:33 4    is, Road, Laurel, Maryland. I don't remember the zip.
11:34 5        Q    That's okay, we don't need the zip code.
11:34 6            How long did you reside at Muirkirk Road?
11:34 7        A    I don't know, maybe like three years I
11:34 8    think.
11:34 9        Q    So did you move there around 2004?
11:34 10       A    Yeah, it was something like that.
11:34 11       Q    Do you remember if it was the beginning of
11:34 12   the year, the end of the year?
11:34 13       A    I don't recall. I don't remember.
11:34 14       Q    Were you living --
11:34 15       A    I'm trying to think was it cold or was it
11:34 16   hot outside. That's the only way -- I don't remember.
11:34 17       Q    Were you living there while you were working
11:34 18   at CCA?
11:34 19       A    No.
11:34 20       Q    Did you move there after --
11:34 21       A    Uh-huh.
11:34 22       Q    -- you stopped working at CCA?

Page 9

11:34 1        A    Yes.
11:34 2        Q    And where were you residing when you were
11:34 3    working at CCA?
11:34 4        A    Well, two places. Before I met my husband I
11:34 5    was living with my mom, and I moved with my husband,
11:34 6    so while I was working at CCA I lived with my husband.
11:34 7        Q    Did you live with your husband the entire
11:34 8    time that you worked at CCA?
11:35 9        A    Yeah. Well, I think --
11:35 10           MS. WHITE: No, it was your mom. It was
11:35 11   your mom.
11:35 12           THE WITNESS: No, wait a minute. I think --
11:35 13           MS. WHITE: You weren't even married to him
11:35 14   then.
11:35 15           THE WITNESS: Um, I think when I first moved
11:35 16   there -- I think when I first moved there my address
11:35 17   was still 11106. I think -- it's 2006 -- it's been so
11:35 18   long. 2002 is when I got hired. So 2003 is -- me
11:35 19   and -- 2003 is when we moved in together. So it was
11:35 20   2003 when we moved in together.
11:35 21   BY MS. DAVIS:
11:35 22       Q    And did you get married in 2003?

3 (Pages 6 to 9)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 10

11:35 1      A   2005.
11:35 2      Q   And do you still live with your husband in
11:35 3   Waldorf?
11:35 4      A   Uh-huh.
11:35 5      Q   Does anybody else reside at the residence
11:35 6   with you?
11:35 7      A   Children.
11:35 8      Q   How many children?
11:35 9      A   Two.
11:35 10     Q   And what are their names?
11:35 11     A   Kshanti, K-S-H-A-N-T-I, and Yasmine.
11:35 12     Q   And how old is Kshanti?
11:35 13     A   Eight.
11:35 14     Q   And Jasmine?
11:35 15     A   With a Y, Yasmine.
11:35 16     Q   Yasmine?
11:35 17     A   She will be one the 25th of this month.  So
11:35 18  she is 11 and a half months old.
11:36 19     Q   Do you have any other children?
11:36 20     A   Huh-uh.  No.
11:36 21     Q   Did you graduate from high school?
11:36 22     A   Yes.

Page 11

11:36 1      Q   Where did you go to high school?
11:36 2      A   Largo.
11:36 3      Q   And when did you graduate from there?
11:36 4      A   Um, '99.
11:36 5      Q   And what did you do after you graduated from
11:36 6   high school?
11:36 7      A   Began working.
11:36 8      Q   Did you go to college?
11:36 9      A   Secondary school, I went to medical
11:36 10  assistant school.
11:36 11     Q   And when was that?
11:36 12     A   I think it was -- I think I started in two
11:36 13  thousand -- maybe the end of 2003, early 2004,
11:36 14  something like that.  I was going to school while I
11:36 15  was working at CCA, I remember that, though.
11:36 16     Q   Where did you work prior to being employed
11:36 17  with CCA?
11:36 18     A   Actually when I started working with CCA I
11:37 19  was not at work.  You know, like I came there after
11:37 20  being off.  I had my daughter in '99, so I had to be
11:37 21  at home with her prior to going to CCA.
11:37 22     Q   And when did you start working at CCA?

Page 12

11:37 1      A   I think it was the end of 2002.
11:37 2      Q   So from 1999 through 2002 you weren't
11:37 3   employed?
11:37 4      A   No, I just don't -- it's been so many years,
11:37 5   I'm just trying to think.  In '99 when I had my
11:37 6   daughter I didn't work because I had her, and then
11:37 7   2001 I think I started to try to go back to work, and
11:37 8   I think maybe I did like a temp agency.  So that
11:37 9   doesn't, you know -- after that I -- hm, it's been so
11:37 10  long -- I worked for a company in Largo named RCI, and
11:38 11  because of like daycare issues I couldn't work there
11:38 12  anymore.  So that's why I am saying it was like a
11:38 13  in -- in between.
11:38 14         (Deposition Exhibit Number 2
11:38 15         was marked for identification.)
11:39 16     MS. DAVIS:  I'm showing you what's been
11:39 17  marked as Jackson Exhibit Number 2.
11:39 18     I have a copy for the witness.
11:39 19     THE WITNESS:  Oh.
11:39 20  BY MS. DAVIS:
11:39 21     Q   Do you recognize that document?
11:39 22     A   Uh-huh.

Page 13

11:39 1      Q   What is it?
11:39 2      A   Um, um, resumé.
11:39 3      Q   Whose resumé?
11:39 4      A   Mine.
11:39 5      Q   Looking at that resumé does that refresh
11:39 6   your recollection as to whether or not you were
11:39 7   employed from 1999 until you started working for CCA?
11:39 8      A   When you say refresh, I don't understand
11:39 9   what you mean.  Because I told you based on my
11:39 10  knowledge where I did work, but when you said refresh,
11:39 11  what do you mean?
11:39 12     Q   But looking at your resumé does that help
11:39 13  you remember if you worked anywhere else other than
11:39 14  RCI --
11:39 15     A   Oh, okay.
11:39 16     Q   -- after 1999?
11:39 17     A   Yeah, uh-huh.
11:39 18     MS. WHITE:  Answer the question yes or no.
11:39 19     THE WITNESS:  Yes.
11:39 20  BY MS. DAVIS:
11:39 21     Q   And does this resumé accurately reflect that
11:40 22  you worked at Wal-Mart in January 2000 through 2001?

4 (Pages 10 to 13)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 14

| | | |
|---|---|---|
| 11:40 | 1 | A   Correct. |
| 11:40 | 2 | Q   And in addition you also worked for Lowes |
| 11:40 | 3 | Theater -- |
| 11:40 | 4 | A   Yeah. |
| 11:40 | 5 | Q   -- February 1999 through 2000? |
| 11:40 | 6 | A   Correct. |
| 11:40 | 7 | Q   Looking at this résumé are there any other |
| 11:40 | 8 | jobs that you now recall that you held from 1999 until |
| 11:40 | 9 | you started working for CCA? |
| 11:40 | 10 | A   Not that I know of, no. |
| 11:40 | 11 | (Deposition Exhibit Number 3 |
| 11:40 | 12 | was marked for identification.) |
| 11:41 | 13 | Q   I'm showing you what has been marked as |
| 11:41 | 14 | Jackson Exhibit Number 3.  Do you recognize that |
| 11:41 | 15 | document? |
| 11:41 | 16 | A   Yeah. |
| 11:41 | 17 | Q   What is it? |
| 11:41 | 18 | A   Application for CCA. |
| 11:41 | 19 | Q   And is that your application for CCA? |
| 11:41 | 20 | A   Yes. |
| 11:41 | 21 | Q   If you turn to the last page, is that your |
| 11:41 | 22 | signature on the application? |

Page 15

| | | |
|---|---|---|
| 11:41 | 1 | A   It is. |
| 11:41 | 2 | Q   Are you currently employed? |
| 11:41 | 3 | A   No. |
| 11:41 | 4 | Q   Have you been employed since you stopped |
| 11:41 | 5 | working for CCA? |
| 11:41 | 6 | A   I worked for a temp agency. |
| 11:41 | 7 | Q   When did you work for a temp agency? |
| 11:41 | 8 | A   In '0 -- this is '08 now.  So in '06. |
| 11:42 | 9 | Q   Which temp agency did you work for? |
| 11:42 | 10 | A   I think it is Kelly. |
| 11:42 | 11 | Q   And do you recall what assignments you had |
| 11:42 | 12 | when you were with Kelly Services? |
| 11:42 | 13 | A   Just medical assistant. |
| 11:42 | 14 | Q   Do you recall which doctors' offices or |
| 11:42 | 15 | practices you worked with? |
| 11:42 | 16 | A   No. |
| 11:42 | 17 | Q   How long did you work with Kelly Services? |
| 11:42 | 18 | A   Well, I had my daughter, so I got -- I |
| 11:42 | 19 | became -- I -- you know, I have a 11 month old, so I |
| 11:42 | 20 | stayed home.  Maybe three months to being pregnant |
| 11:42 | 21 | until now. |
| 11:42 | 22 | Q   So prior to getting pregnant you worked |

Page 16

| | | |
|---|---|---|
| 11:42 | 1 | through Kelly Services for three months? |
| 11:42 | 2 | A   Exactly. |
| 11:42 | 3 | Q   And since having your -- |
| 11:42 | 4 | A   No.  Well, I was almost like -- almost I |
| 11:42 | 5 | think three months when I stopped working. |
| 11:42 | 6 | Q   You were -- |
| 11:42 | 7 | A   I was on bedrest. |
| 11:42 | 8 | Q   You were three months pregnant when you |
| 11:42 | 9 | stopped? |
| 11:42 | 10 | A   Yeah.  I think it was three months. |
| 11:42 | 11 | Q   So how long were you taking assignments from |
| 11:42 | 12 | Kelly Services? |
| 11:42 | 13 | A   Maybe like -- maybe about two months or two |
| 11:43 | 14 | and a half months. |
| 11:43 | 15 | Q   And why did you sign up with Kelly Services? |
| 11:43 | 16 | A   For employment. |
| 11:43 | 17 | Q   Why did you decide in 2006 to sign up for |
| 11:43 | 18 | employment with Kelly Services? |
| 11:43 | 19 | A   For gainful employment. |
| 11:43 | 20 | Q   Now, you testified that -- when did you stop |
| 11:43 | 21 | working for CCA? |
| 11:43 | 22 | A   I'm not even sure of the exact date.  It's |

Page 17

| | | |
|---|---|---|
| 11:43 | 1 | been a while.  I think from my recollection that it |
| 11:43 | 2 | was in '04. |
| 11:43 | 3 | MS. WHITE:  Four, I think September of '04. |
| 11:43 | 4 | MS. DAVIS:  Counsel, I would request -- |
| 11:43 | 5 | THE WITNESS:  '04. |
| 11:43 | 6 | MS. DAVIS:  -- that you not testify for the |
| 11:43 | 7 | witness. |
| 11:43 | 8 | MS. WHITE:  Oh, I'm not testifying. |
| 11:43 | 9 | MS. DAVIS:  You are testifying if -- |
| 11:43 | 10 | MS. WHITE:  I'm talking to her. |
| 11:43 | 11 | MS. DAVIS:  You can't talk to her while the |
| 11:43 | 12 | questions are pending, and you cannot coach your |
| 11:43 | 13 | witness when the questions are being asked. |
| 11:43 | 14 | THE WITNESS:  Well, no, I had already |
| 11:43 | 15 | said -- |
| 11:43 | 16 | MS. WHITE:  I'm not coaching her. |
| 11:43 | 17 | THE WITNESS:  I already said '04. |
| 11:43 | 18 | BY MS. DAVIS: |
| 11:43 | 19 | Q   That's fine, but your counsel is not |
| 11:43 | 20 | permitted under the rules to answer for you or to give |
| 11:43 | 21 | you the answer when I have asked you a question.  So |
| 11:44 | 22 | if I ask you a question, you have to answer my |

5 (Pages 14 to 17)

DEBORAH L. SPEAR, COURT REPORTER
(301)843-9370 / (301)641-0556

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 18

11:44 1  question, --
11:44 2      A   As I did.
11:44 3      Q   -- and then --
11:44 4      A   Okay.
11:44 5      Q   -- if your attorney would like to talk to
11:44 6  you, she can request a break.
11:44 7      A   Okay.
11:44 8      Q   And we can leave the room.
11:44 9      A   Okay.
11:44 10     Q   But while the question is pending you must
11:44 11 talk to me.  So back to my question.
11:44 12         MS. WHITE:  Just answer her question.
11:44 13 BY MS. DAVIS:
11:44 14     Q   When did you stop working for CCA?
11:44 15     A   As stated prior to this, I believe '04.
11:44 16     Q   And you said you started accepting temporary
11:44 17 assignments through Kelly Services in 2006?
11:44 18     A   Correct.
11:44 19     Q   Why did you not seek employment from 2004
11:44 20 through 2006?
11:44 21     A   Because I was extremely dispressed(sic) --
11:44 22 distressed and distraught from the harassment and

Page 19

11:44 1  abuse that I received from Corrections Corporation
11:44 2  facility.
11:44 3      Q   Did you receive any treatment for this
11:44 4  distress, for being distraught?
11:44 5      A   From my primary care physician.
11:44 6      Q   And who is your primary care physician?
11:44 7      A   At the time it was Dr. Loya.
11:45 8      Q   How do you spell Loya?
11:45 9      A   L-O-Y-A.  And then my treatment --
11:45 10 L-O-Y-A -- and then my treatment stopped because they
11:45 11 cut my insurance off.
11:45 12     Q   Were you hospitalized from 2004 through
11:45 13 2006?
11:45 14     A   Hospitalized meaning -- I don't understand
11:45 15 the question.
11:45 16     Q   Were you ever in the hospital because of
11:45 17 your depression?
11:45 18     A   I was in the hospital while I worked for
11:45 19 CCA.  I have panic attack syndrome, and while working
11:45 20 for CCA I did go to the hospital on several occasions.
11:45 21     Q   Have you been to the hospital since you
11:45 22 stopped working for CCA?

Page 20

11:45 1      A   For a panic attack I think maybe like twice.
11:45 2      Q   And when was the first time that you went to
11:45 3  the hospital for a panic attack?
11:45 4      A   I don't recall, it's...
11:45 5      Q   Which hospital did you go to?
11:45 6      A   Um -- it's been so long.  I think it was --
11:46 7  I think it was Prince -- I don't know, I think it was
11:46 8  Prince George's, I think.  It's been a long time.
11:46 9      Q   Is there anything that would help you
11:46 10 remember which hospital you went to?
11:46 11     A   Not at this time.  It's been a --
11:46 12     Q   Do you have any medical bills?
11:46 13     A   I recently moved, so I don't even have that
11:46 14 stuff.
11:46 15     Q   Who was your treating physician when you
11:46 16 went to the hospital!
11:46 17     A   I don't know that person's name.
11:46 18     Q   It wasn't Dr. Loya?
11:46 19     A   Huh-uh.
11:46 20     Q   Do you recall if you went to the hospital
11:46 21 shortly after you left employment with CCA?
11:46 22     A   I don't understand.  Say that again.

Page 21

11:46 1      Q   When did you go to the hospital the first
11:46 2  time since your termination --
11:46 3      A   Um --
11:46 4      Q   -- from CCA because of a panic attack?
11:47 5      A   As far as a date you are saying?
11:47 6      Q   Yes.
11:47 7      A   I think the first time after I left CCA I
11:47 8  went to my primary care physician office for being
11:47 9  ill, but then after that -- I don't know -- it's
11:47 10 almost hard -- impossible for me to answer that.  It's
11:47 11 2008 now.  I don't specifically remember.
11:47 12     Q   Ms. Jackson, you have filed a lawsuit
11:47 13 against your former employer in which you claim that
11:47 14 they are responsible for your panic attacks and you
11:47 15 are claiming damages.
11:47 16     A   (Witness nodded head affirmatively.)
11:47 17     Q   I'm sure as your attorney has told you, you
11:47 18 have to be able to prove those damages.
11:47 19     A   (Witness nodded head affirmatively.)
11:47 20     Q   Therefore we need to know when you went to
11:47 21 the hospital and which doctors you saw.
11:47 22         MS. WHITE:  I object to that question

6 (Pages 18 to 21)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 22

11:47  1  because she has asked and answered it. She said she
11:47  2  does not recall.
11:47  3        MS. DAVIS: I am giving her the opportunity
11:47  4  to answer. It would help her case if she remembered.
11:48  5  BY MS. DAVIS:
11:48  6     Q   The second time that you went to the
11:48  7  hospital, did you see your primary physician at that
11:48  8  time?
11:48  9     A   Are you ref -- I don't understand. Are you
11:48 10  referring to in the hospital?
11:48 11     Q   You testified previously that you can recall
11:48 12  at least two occasions --
11:48 13     A   Uh-huh.
11:48 14     Q   -- when you went to the hospital since you
11:48 15  stopped working for CCA --
11:48 16     A   Uh-huh.
11:48 17     Q   -- because of a panic attack. Now, I have
11:48 18  tried to get information about the first visit, and
11:48 19  you don't remember that. Now the second visit, when
11:48 20  did that happen?
11:48 21     A   Without the documentation in front of me
11:48 22  it's almost impossible for me to answer that question

Page 23

11:48  1  to a specific time or date. I think if I -- see, I
11:48  2  don't even remember the exact -- if I was terminated
11:48  3  in 2004 -- two thousand and -- I was terminated in
11:49  4  September 2004. So September, October, November,
11:49  5  December, January, February -- hm, it was -- oh my
11:49  6  God, I don't remember the exact date. I don't
11:49  7  remember the exact date. Maybe like -- maybe like a
11:49  8  -- maybe like a couple months after that, after the
11:49  9  first time I visited. So maybe like six months later
11:49 10  the second time, three months from the first time, if
11:49 11  you understand what I am saying.
11:49 12     Q   Are you testifying that you went to the
11:49 13  hospital the second time three months after your first
11:49 14  visit to the hospital?
11:49 15     A   To what I can recall. I don't -- it's
11:49 16  almost like you are asking me to give me a specific
11:49 17  time and a date, and I can't do that. I have already
11:49 18  told you I couldn't remember specifically.
11:49 19     Q   Now, you said without the documents you
11:49 20  can't give me the exact dates. Do you have the
11:49 21  documents that would help you remember?
11:49 22     A   I would have to like research. I would have

Page 24

11:50  1  to like go back to the hospital and do all that. You
11:50  2  know, I don't have that stuff with he.
11:50  3     Q   When you checked out of the hospital did
11:50  4  they give you any records?
11:50  5     A   Not records, no, just the regular discharge
11:50  6  form.
11:50  7     Q   They gave you a discharge form --
11:50  8     A   Correct.
11:50  9     Q   -- that would have had --
11:50 10     A   Most of my care was from my primary care
11:50 11  physician regarding my panic attacks because that's
11:50 12  not something that you normally go to an emergency
11:50 13  room for, but if he was closed and I had to seek
11:50 14  medical treatment for panic attacks, that's where I
11:50 15  would go.
11:50 16     Q   So you would have been given a discharge
11:50 17  record --
11:50 18     A   Yes.
11:50 19     Q   -- when you left the hospital?
11:50 20     A   Yes.
11:50 21     Q   And the discharge record would have had the
11:50 22  date as to when you visited the hospital?

Page 25

11:50  1     A   Presumably, yes, it should.
11:50  2        (Deposition Exhibit Number 4
11:50  3         was marked for identification.)
11:50  4     Q   I'm showing you what has been marked as
11:50  5  Jackson Exhibit Number 4. Do you recognize that
11:51  6  document?
11:51  7     A   Yes.
11:51  8     Q   What is it?
11:51  9     A   Superior Court complaint paperwork.
11:51 10     Q   And at the bottom of the complaint on the
11:51 11  right-hand side there is a signature. Is that your
11:51 12  signature?
11:51 13     A   Correct.
11:51 14     Q   Did you draft this complaint?
11:51 15     A   Yes.
11:51 16     Q   Did anybody assist you in drafting it?
11:51 17     A   No.
11:51 18     Q   And do you recall what date you filed this
11:51 19  complaint?
11:51 20     A   Well, it says here the 12th date of
11:51 21  September '05.
11:51 22     Q   Do you recall if you went to the hospital

DEBORAH L. SPEAR, COURT REPORTER
(301)843-9370 / (301)641-0556

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 26

11:51 1    after the 12th of September 2005 --
11:51 2        A   I don't --
11:51 3        Q   -- for a panic attack?
11:51 4        A   I don't recall.  '05, '6, '7, 8, yeah, it's
11:51 5    been a long time.
11:51 6        Q   Have you preserved all records related to
11:52 7    this case?
11:52 8        A   To the best of my ability.
11:52 9        Q   And have you preserved all medical records?
11:52 10       A   To the best of my ability.
11:52 11       Q   You said you recently moved in the last
11:52 12   year.
11:52 13       A   Correct.
11:52 14       Q   Did you throw away any documents that would
11:52 15   be related to this case?
11:52 16       A   Hopefully not, but a lot of my stuff as far
11:52 17   as paperwork may be in storage, and then some of my
11:52 18   other stuff because of moving I haven't been able to
11:52 19   find, but, you know...
11:52 20       Q   Well, I would request that a search be done
11:52 21   for any medical records relating to hospitalization
11:52 22   since 2004 for panic attacks.

Page 27

11:52 1        MS. WHITE:  Objection.  I think we have
11:52 2    given you that --
11:52 3        THE WITNESS:  Yeah, I have given it.
11:52 4        MS. WHITE:  -- information in your request
11:52 5    for production of documents a year ago.
11:52 6        THE WITNESS:  Yeah.
11:52 7        MS. WHITE:  Two years ago.
11:52 8        MS. DAVIS:  We have no documents relating to
11:52 9    hospitalization after termination from CCA.
11:52 10       THE WITNESS:  Well, only my -- my pri -- you
11:52 11   are referring --
11:52 12       MS. WHITE:  Okay.
11:52 13       THE WITNESS:  Can I say something?
11:52 14       MS. WHITE:  No, answer the questions,
11:52 15   Renita.
11:52 16       THE WITNESS:  Well --
11:52 17       MS. WHITE:  I'm not -- we are not going to
11:52 18   sidebar.  Stop.
11:53 19   BY MS. DAVIS:
11:53 20       Q   So at the time that you moved recently do
11:53 21   you recall if you saw any medical records relating to
11:53 22   stays in hospitals?

Page 28

11:53 1        A   I wasn't looking for that stuff when I
11:53 2    moved.  I was, you know, telling the movers where to
11:53 3    move my stuff.
11:53 4        Q   When you filed your complaint on September
11:53 5    12, 2005 were you represented by counsel?
11:53 6        A   When I filed this complaint here in front of
11:53 7    me?
11:53 8        Q   Looking at Exhibit Number 4, when you filed
11:53 9    that with the Superior Court.
11:53 10       A   No, I was pro se.
11:53 11       Q   When did you retain counsel?
11:53 12       A   I think it was -- I think it was in '06.
11:54 13       COURT REPORTER:  I didn't hear you.
11:54 14       THE WITNESS:  I think it was in '06.
11:54 15       (Deposition Exhibit Number 5
11:54 16       was marked for identification.)
11:54 17   BY MS. DAVIS:
11:54 18       Q   I'm showing you what has been marked as
11:54 19   Jackson Exhibit Number 5.  Have you seen this document
11:54 20   before?
11:54 21       A   Yes.
11:54 22       Q   Do you recognize it?

Page 29

11:54 1        A   Well, let me see.  Yes.
11:54 2        Q   Looking at the last page of this document,
11:54 3    is that your signature?
11:55 4        A   It is.
11:55 5        Q   And beside your signature is a date of March
11:55 6    4, 2006.  Does that help you remember when you
11:55 7    retained counsel?
11:55 8        A   Like I said, it was in '06.  So if this is
11:55 9    dated March, then it was shortly before this paper,
11:55 10   this document was entered.
11:55 11       Q   Now, you said you worked for about two and a
11:55 12   half months before you had to go on bedrest with Kelly
11:55 13   Services.  Do you recall how much you earned prior to
11:55 14   going on bedrest?
11:55 15       A   Um, I don't -- oh, my God.  When you say
11:55 16   earned, are you re -- what are you referring to as far
11:55 17   as...
11:55 18       Q   What was your net income as a result of
11:55 19   assignments that you received from Kelly Services?
11:55 20       A   Are you talking about for a two month
11:56 21   period, are you talking about hourly?  What are you --
11:56 22   I don't understand.

DEBORAH L. SPEAR, COURT REPORTER
(301)843-9370 / (301)641-0556

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 30

11:56  1      Q   I am asking you what was the total income
11:56  2  that you earned while you were working for Kelly
11:56  3  Services for those two and a half months?
11:56  4      A   I don't know.  I don't -- I don't recall
11:56  5  that.
11:56  6      Q   Do you have the paystubs from the time when
11:56  7  you were working for Kelly Services?
11:56  8      A   I don't know.  I -- it's -- I don't keep
11:56  9  stuff like that.  I don't know.  I don't -- I don't
11:56 10  know.
11:56 11      Q   Looking at Jackson Exhibit Number 5, which
11:56 12  is the exhibit in front of you, I would like you to
11:57 13  turn to page 6.  I would like to direct your attention
11:57 14  to interrogatory number 8.  I will give you an
11:57 15  opportunity to look at it before I ask my question.
11:57 16      A   (Witness reviewing document.)
11:57 17      Q   Have you had a chance to read it?
11:57 18      A   (Witness nodded head affirmatively.)
11:57 19      Q   Prior to today have you had an opportunity
11:57 20  to look at interrogatory number 8?
11:57 21      A   Yes.
11:57 22      Q   Interrogatory number 8 relates to the

Page 31

11:57  1  calculation of your damages, and you say you have lost
11:57  2  wages of $50,000.  What's the basis of that
11:57  3  calculation?
11:57  4      A   Based on not being able to have employment
11:58  5  due to being terminated from CCA.
11:58  6      Q   Does that lost wages take into account any
11:58  7  employment that you had after you left CCA?
11:58  8      A   I don't know what you mean when you say take
11:58  9  into account.  What does that mean?  What are you --
11:58 10      Q   The calculation of 50 --
11:58 11      A   Can you rephrase it?
11:58 12      Q   The calculation of $50,000 --
11:58 13      A   Uh-huh.
11:58 14      Q   -- you said is based on the fact that you
11:58 15  were unable to find work --
11:58 16      A   Right.
11:58 17      Q   -- after you left CCA?
11:58 18      A   Right.
11:58 19      Q   Now, you have testified that you have been
11:58 20  employed since then?
11:58 21      A   For two months, okay.
11:58 22      Q   Does that $50,000 account for the money that

Page 32

11:58  1  you earned while you were working for a temp agency?
11:58  2      A   I don't un -- I still don't understand what
11:58  3  you mean when you say account for the money.  I'm -- I
11:58  4  don't understand what that means.
11:58  5      Q   Okay, let's go back.
11:59  6      A   Okay.  When you say account --
11:59  7      Q   How did you calculate the amount of lost
11:59  8  wages?
11:59  9      A   Based on my wrongful termination from the
11:59 10  Corrections Corporation of America.
11:59 11      Q   Where did the numbers come from?
11:59 12      A   Actually the numbers since this document has
11:59 13  been produced would probably be different.  It would
11:59 14  probably be higher.
11:59 15      Q   And why would it be higher?
11:59 16      A   Based on the fact that I have been not
11:59 17  employed from -- I was terminated from CCA in 2004,
11:59 18  just based on that.
11:59 19      Q   So this number would keep going up even
11:59 20  though you have worked since you left CCA?
11:59 21      A   I'm just testifying to the fact that you
11:59 22  asked how would this reflect.  I only worked for two

Page 33

11:59  1  months, so that's the only -- that's the best way I
11:59  2  can answer the question to my knowledge.
11:59  3      Q   So in calculating lost wages did you base it
11:59  4  on your final income for wages when you left CCA?
11:59  5      A   Based on -- I don't -- I actually don't do
11:59  6  the calculation as far as that's concerned, but based
12:00  7  on 2004, being terminated in 2004, to 2006 when this
12:00  8  document was filed, I believe that was the number at
12:00  9  that point in time.
12:00 10      Q   Do you have any tax returns for 2002?
12:00 11      A   No.
12:00 12      Q   2003?
12:00 13      A   No.
12:00 14      Q   2004?
12:00 15      A   I don't.
12:00 16      Q   2005?
12:00 17      A   I don't.
12:00 18      Q   2006?
12:00 19      A   No.
12:00 20      Q   2007, do you have a W-2 as yet for 2007?
12:00 21      A   No, I didn't work.
12:00 22      Q   Why don't you have any tax returns for 2002?

9 (Pages 30 to 33)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 34

12:00 1      A   It was explained to me that since I didn't
12:00 2  make enough money because I was not employed that I
12:00 3  could wait three years to file from the date, up to
12:00 4  three years. So I didn't have a job, I didn't have
12:00 5  any money, so I didn't have anything to file.
12:00 6      Q   Weren't you working at CCA in 2002?
12:00 7      A   I started at CCA at the end of 2002, and
12:00 8  because it was the end of 2002 I did not incur enough
12:00 9  money at that time as far as I was concerned to even
12:00 10 file taxes.
12:01 11     Q   Did you receive a W-2 from CCA in 2002?
12:01 12     A   I think I -- I think from two thousand --
12:01 13 for 2002, if I can recall, CC -- I had to request --
12:01 14 I think I had to request one because I didn't get one.
12:01 15 I had to request one.
12:01 16     Q   Do you have a W-2 for 2003?
12:01 17     A   No, I -- actually I'm in the process of
12:01 18 trying to get one now.
12:01 19     Q   Did you file a tax return in 2003?
12:01 20     A   From Corrections Corporation? No.
12:01 21     Q   Did you file a personal income tax form with
12:01 22 the IRS in 2003?

Page 35

12:01 1      A   From CCA, no.
12:01 2      Q   Did you file an income tax form with the IRS
12:01 3  in 2003?
12:01 4      A   I don't understand the question.
12:01 5      MS. WHITE:  Objection.  You just asked the
12:01 6  question.  You said 2003 two times.
12:01 7      MS. DAVIS:  She qualified my question from
12:01 8  CCA.  I'm not asking about CCA.  I'm asking did she
12:01 9  file a personal income tax form with the IRS.  It has
12:01 10 nothing to do with CCA.
12:01 11     THE WITNESS:  Well, what is a personal
12:01 12 income tax form?
12:01 13     MS. WHITE:  1040.
12:01 14 BY MS. DAVIS:
12:01 15     Q   Did you file a 1040, a 1040EZ?
12:02 16     A   No.
12:02 17     Q   Did you file an income tax form with the IRS
12:02 18 in 2004?
12:02 19     A   No.
12:02 20     Q   Did you receive a W-2 from CCA in 2004?
12:02 21     A   I don't think I did, so I had to request
12:02 22 one.  I don't recall.

Page 36

12:02 1      MS. WHITE:  We need to take a break.
12:02 2      MS. DAVIS:  We can take a break.
12:02 3      (Whereupon, there was a brief recess.)
12:07 4      MS. DAVIS:  We can go back on the record.
12:09 5  BY MS. DAVIS:
12:09 6      Q   Earlier you testified that you started
12:09 7  working for CCA in 2002.  How did you learn about the
12:09 8  position at CCA?
12:09 9      A   Um, I knew somebody that worked there, and,
12:09 10 you know, they were hiring.
12:09 11     Q   Who did you know who worked at CCA?
12:09 12     A   Oh, my God, it's been so long I don't even
12:09 13 remember the girl's name.  I think her last name may
12:09 14 have been Johnson or something.
12:09 15     Q   And what position did you apply for with
12:09 16 CCA?
12:09 17     A   Maintenance Department, Maintenance
12:09 18 Administrative Assistant.
12:09 19     Q   And what were your job responsibilities as
12:09 20 Maintenance Administrative Assistant?
12:10 21     A   Answering the phones, calling in
12:10 22 contractors, filing, getting, what do you call them,

Page 37

12:10 1  it's been a while, excuse me, purchase orders taken
12:10 2  care of, a lot of stuff.
12:10 3      Q   Did you have to be interviewed for the job?
12:10 4      A   Yes.
12:10 5      Q   Do you recall who you interviewed with?
12:10 6      A   Two people, Jackie Smith and Warden
12:10 7  Figueroa.
12:10 8      Q   Did Jackie Smith's name change while you
12:10 9  were employed at CCA?
12:10 10     A   It did, but I don't -- I don't know what her
12:10 11 last name is.  I don't recall what her last name may
12:10 12 be now.
12:11 13     Q   Was she Jackie Wilkins at any time?
12:11 14     A   Oh, okay.  Yeah, it was Wilkins.
12:11 15     Q   Did you interview with anybody else other
12:11 16 than Jackie Smith or Fred Figueroa?
12:11 17     A   Not that I can recall.
12:11 18     Q   And when you started working who was your
12:11 19 supervisor?
12:11 20     A   Immediate?
12:11 21     Q   Yes, your immediate supervisor.
12:11 22     A   Jackie Smith.

10 (Pages 34 to 37)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 38

12:11  1   Q   And who was your next level supervisor?
12:11  2   A   Fred Figueroa.
12:11  3   Q   While you were employed at CCA did that
12:11  4   supervisor relationship ever change?
12:11  5   A   With whom?
12:11  6   Q   Did your supervisors change while you were
12:11  7   employed at CCA?
12:11  8   A   Yes.
12:11  9   Q   Do you recall when they changed?
12:12 10   A   Um --
12:12 11   Q   Ms. Jackson, if you need any document to
12:12 12   refresh your recollection or memory, I will provide
12:12 13   them to you.
12:12 14   A   Okay.  You didn't state that prior to us
12:12 15   starting, so I didn't know.
12:12 16   Q   That's why --
12:12 17   A   Thank you.
12:12 18   Q   That's why I am telling you now.
12:12 19   A   Okay, thank you for letting me know.  Okay.
12:12 20   So am I supposed to ask you for the document?  I don't
12:12 21   know how to do this.
12:12 22   Q   I will ask you the questions.  If you can't

Page 39

12:12  1   remember without looking at --
12:12  2   A   Okay, I can't remember.  I don't remember.
12:12  3   Q   Is there a document that you could look at
12:12  4   that would help you recall when it changed?
12:12  5   A   Possibly if I -- if you can supply me with
12:12  6   the document where I wrote my supervisor Jackie Smith
12:12  7   up.  I wrote -- it maybe was in 2003.
12:12  8   Q   Why did you write Jackie Smith up?
12:12  9   A   Because she was creating a hostile work
12:12 10   environment for me, and she was preventing me from
12:12 11   being able to do my job by placing the lock-out key in
12:12 12   the door and slandering my name, amongst many other
12:13 13   things.
12:13 14   Q   How was she slandering your name?
12:13 15   A   Basically trying to go around and just talk
12:13 16   -- say things that weren't true.
12:13 17   Q   What was she saying that was untrue?
12:13 18   A   She don't know how to -- she don't know how
12:13 19   to do this and she don't know how to that as far as
12:13 20   this is concerned, like, you know, not even as far as
12:13 21   my job was concerned.  She would just talk about
12:13 22   personal off the job type of situations that she knew

Page 40

12:13  1   nothing as far as I was concerned.  And she also used
12:13  2   to curse at me and think that it was okay.  She would
12:13  3   talk in a condescending way and think that was okay.
12:13  4   Q   What types of personal issues would she talk
12:13  5   about that you didn't think she had the right to?
12:13  6   A   Telling someone that I was pregnant, which
12:13  7   is my personal business, which under the HIPAA law she
12:13  8   is not supposed to disclose to anyone, and that I had
12:13  9   had a miscarriage.  She told that to other employees,
12:14 10   and she was not supposed to disclose any of my
12:14 11   personal and medical documentation that I supplied to
12:14 12   her as my supervisor.  I gave it to her under con --
12:14 13   confidential terms, and I expected it to stay that
12:14 14   way.
12:14 15   Q   Who did she disclose the paperwork to?
12:14 16   A   Several people who at this -- I mean Rhonda
12:14 17   Smith.
12:14 18   Q   Who is Rhonda Smith?
12:14 19   A   I mean not Rhonda Smith.  Oh, God, I don't
12:14 20   even know her last name.  Rhonda Williams maybe,
12:14 21   Williams.
12:14 22   Q   And who is Rhonda Williams?

Page 41

12:14  1   A   I think she is a Personnel Manager.
12:14  2   Q   Who else did she disclose it to?
12:14  3   A   I don't remember any other names at this
12:14  4   time.  I just -- I know it was a lot of people she was
12:14  5   telling.  I don't remember anybody else's name.
12:14  6   Q   When you wrote up Ms. Smith did you identify
12:14  7   the people that she told?
12:14  8   A   I don't recall.
12:14  9   Q   Do you recall when this happened in 2003?
12:14 10   A   When what happened?
12:14 11   Q   When you wrote up Ms. Smith.
12:15 12   A   Do I recall a month you are asking?
12:15 13   Q   Yes.
12:15 14   A   It was toward the beginning of the year I
12:15 15   believe as far as my recollection.
12:15 16   Q   And what happened after you wrote up
12:15 17   Ms. Smith?
12:15 18   A   I was told there would be an investigation.
12:15 19   Q   Was there an investigation?
12:15 20   A   Not as far as I am concerned.
12:15 21   Q   Why don't you believe there was an
12:15 22   investigation?

11 (Pages 38 to 41)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 42

12:15 1    A  Because all the maintenance employees came
12:15 2    to me and told me that Jackie is laid back, and that
12:15 3    she lets them do whatever she wants to do, and that
12:15 4    she is a female and they are all men, so if they told
12:15 5    the truth, basically that they would have somebody
12:15 6    else come back here and try to like run them, and they
12:15 7    wasn't going to do that.
12:15 8    Q  I don't understand what that has to do with
12:15 9    CCA conducting an investigation.
12:15 10   A  No, that's what I am telling you.  They
12:15 11   supposedly conducted an investigation based on
12:15 12   employees that worked alongside with me in the
12:15 13   Maintenance Department, and because half of them were
12:15 14   fearful of being retaliated against and half of them
12:15 15   didn't want to say anything to rock the boat because
12:16 16   they didn't want a new supervisor to come in here if
12:16 17   she was removed, that's what that had to do with.  So
12:16 18   their investigation was tainted as far as I'm
12:16 19   concerned.
12:16 20   Q  So you are saying that your coworkers lied
12:16 21   during the investigation?
12:16 22   A  Absolutely.

Page 43

12:16 1    Q  What lies did they tell?
12:16 2    A  Um, I said that, you know, just as an
12:16 3    example, Jackie Smith, she -- as a retaliation she
12:16 4    moved my desk out of the office where my desk had been
12:16 5    for a long period of time, and she placed a lock-out
12:16 6    key in the door, which is a practice that she had not
12:16 7    done prior to me being employed from what I was told,
12:16 8    and while I was employed there for almost, you know, I
12:16 9    don't know, five or six months there was no lock-out
12:16 10   key, but then she all of a sudden started doing that,
12:16 11   and when they were asked about the lock-out key they
12:16 12   acted like -- they said they didn't know about it, or,
12:16 13   you know, we never seen it, or she always does it, but
12:16 14   I have -- you know.
12:16 15   Q  What's a lock-out key?
12:16 16   A  It's -- oh, that door doesn't have it.  If
12:17 17   there is a lock on the door, a key fits in as a whole.
12:17 18   A lock-out key would be half of that key, a half of a
12:17 19   key that goes into a door to prevent a whole key from
12:17 20   going into the door, almost like a door stopper.
12:17 21   Q  And what door was the lock-out key put in?
12:17 22   A  On our office door where all of the vendors'

Page 44

12:17 1    names were, contractors' names and numbers were, where
12:17 2    the files were.  So she was precluding me from being
12:17 3    able to do my job.
12:17 4    Q  How did it prevent you from doing your job?
12:17 5    A  Because I couldn't get in that door.  So she
12:17 6    would have me sitting at a desk with a phone, and I
12:17 7    don't even know if I had a computer on the desk
12:17 8    anymore, but just a phone, and she took all my stuff
12:17 9    away from me as like a retaliation, and I couldn't get
12:17 10   in the office to even get it.  So if the phone rang
12:17 11   and it was a vendor, I -- I just could look in the
12:17 12   door.  I couldn't get to the phone.  I couldn't do
12:17 13   anything as far as my job title pertained to.
12:17 14   Q  And how do you know that Ms. Smith was
12:17 15   responsible for the lock-out key in the --
12:18 16   A  She told me.
12:18 17   Q  What did she tell you?
12:18 18   A  She don't want me in her office anymore, and
12:18 19   she is a woman, and she has a period just like I have
12:18 20   a period, and she is going to get rid of me.
12:18 21   Q  What did you understand her to mean by that
12:18 22   statement?

Page 45

12:18 1    A  I didn't understand why she said it.  I
12:18 2    didn't understand why she said it.  She -- I asked a
12:18 3    male employee that worked back there, she said Jackie
12:18 4    don't like working with females, and that's why up
12:18 5    until now you are the only female who has ever been
12:18 6    hired back in the department.
12:18 7    Q  Now, you said that after you wrote her up
12:18 8    there was no investigation --
12:18 9    A  Well, I didn't say no investigation.  I
12:18 10   didn't say no investigation.  I said I believe the
12:18 11   investigation was tainted or whatever, you know, as
12:18 12   far as --
12:18 13   Q  Okay, so as a result of this, quote, tainted
12:18 14   investigation --
12:18 15   A  Uh-huh.
12:18 16   Q  -- you previously testified that your
12:19 17   supervisor changed?
12:19 18   A  Correct.
12:19 19   Q  Now, who changed it?
12:19 20   A  I requested to be moved out of that
12:19 21   department because I was fearful of my safety.  There
12:19 22   were a lot of things going on back there.  I was off

12 (Pages 42 to 45)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 46

12:19  1   on medical leave, and she was, you know, harassing me
12:19  2   to get back to work, and I was told that she was not
12:19  3   supposed to do that, especially because I had already
12:19  4   supplied her with medical documentation.  Also when I
12:19  5   came back to work she asked me to do things that were
12:19  6   not in my job description as an administrative clerk
12:19  7   or assistant.  She asked me to do things that were
12:19  8   unethical and probably criminal as far as I was
12:19  9   concerned, and when I refused to do them, she began to
12:19 10   harass me more.  So I asked to be moved.
12:19 11       Q   CCA has an Ethics Hotline, doesn't it?
12:19 12       A   I'm not sure.  I don't -- I don't know.
12:19 13       Q   Did you report her request that you engage
12:19 14   in unethical or criminal conduct to anybody?
12:19 15       A   I did.
12:19 16       Q   Who did you report it to?
12:20 17       A   To the Warden Figueroa, and to the, what do
12:20 18   you call them, he is -- oh, God, what is his -- what
12:20 19   is his title?  IA?  I -- yeah, the IA person.
12:20 20       Q   Did you report it in writing or orally?
12:20 21       A   I reported it in writing and verbally.  I
12:20 22   did everything in writing.

Page 47

12:20  1       Q   And the result of your request to be moved,
12:20  2   was it granted?
12:20  3       A   I was placed temporarily upstairs I guess
12:20  4   pending their investigation or whatever it was, and
12:20  5   after that was concluded because she was so hostile,
12:20  6   they just never put me back down there I believe.  I
12:20  7   was never -- the only thing -- I received a paper --
12:20  8   as far as what I can recall, I received the papers
12:20  9   from CCA saying that they were going to move me to be
12:21 10   a clerk for the Count desk, and instead of them even
12:21 11   going ahead with that, they just kept me where I was
12:21 12   because I was doing an excellent job in that
12:21 13   department.
12:21 14       Q   And what department were you in?
12:21 15       A   Reservations, and I was told I was doing an
12:21 16   excellent job here, so I will stay here.
12:21 17       Q   And who was your supervisor in Reservations?
12:21 18       A   Um, well, the supervisors changed so many
12:21 19   times, I can't remember because -- it was -- there --
12:21 20   it was -- it was only a Warden, you know, like your
12:21 21   Reservations clerk, then the Warden is supervisor.
12:21 22   Like you don't have a middle man.  And the Wardens

Page 48

12:21  1   were being like terminated left and right.  So they --
12:21  2   I had several of them.  One of them was Warden Denise
12:21  3   King, one of them was Warden Douglas, another one was
12:21  4   -- there were so many.  I can't remember the name of
12:21  5   the other ones.  They were just being term -- they
12:21  6   were just being demoted, or transferred, or leaving,
12:21  7   or something was going on with them.
12:21  8       Q   Were you involved in any discussions where
12:22  9   decisions were made to terminate or transfer wardens?
12:22 10       A   Yes.
12:22 11       Q   What conversations were you involved in?
12:22 12       A   I was asked eventually to write a statement
12:22 13   pertaining to what I had seen in 2000 and -- I think
12:22 14   it was 2004 in regard to Warden Douglas.
12:22 15       Q   And what were you asked to write a statement
12:22 16   about?
12:22 17       A   I was actually -- what -- just what I had --
12:22 18   what I had seen.
12:22 19       Q   And what had you seen?
12:22 20       A   Him just engaging in long conversations with
12:22 21   another subordinate employee, and just the body
12:22 22   language and the gesturing, it just was not something

Page 49

12:22  1   -- the way the jail system or the penal
12:22  2   institutions -- institutions work, a warden is
12:22  3   basically to be respected.  You don't point your
12:22  4   fingers at them, you don't do no moving your head back
12:22  5   and forth or you can be terminated, or wrote up, or
12:22  6   whatever I guess, I don't know.  So she was leaning
12:23  7   over the desk and pointing her finger at him, and just
12:23  8   her body language was in a very ho -- it was very --
12:23  9   her disposition was -- I -- to me seemed like
12:23 10   something else was going on.  And I was knocking on
12:23 11   the door to ask them a question as far as my
12:23 12   department was concerned, and he saw me and I saw him,
12:23 13   and then when he connected eyes with me, I kind of
12:23 14   moved my head out the way because I was like, oh, I
12:23 15   just seen something I wasn't supposed to see, and I
12:23 16   moved out of the way.
12:23 17       Q   Is Warden Douglas a female?
12:23 18       A   Male.
12:23 19       Q   Who is the she who was leaning across the
12:23 20   desk?
12:23 21       A   I think her name was Stuart.
12:23 22       Q   And were you told that Warden Douglas was

13 (Pages 46 to 49)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 50

12:23  1    terminated because of the statement that you provided?
12:23  2        A  Well, no, I didn't say I had anyone
12:23  3    terminated.  I just said I provided a statement based
12:23  4    on something, you know, that concerned one of the
12:23  5    wardens being transferred, moved, or demoted, because
12:23  6    that's what they -- that's -- that's -- that's what
12:23  7    was going on up there.  People were being moved,
12:23  8    demoted, and transferred to other institutions.
12:24  9        Q  Were you asked to write up a statement about
12:24 10    Warden Douglas because CCA wanted to move him?
12:24 11        A  I was really forced to write my statement, I
12:24 12    wasn't asked.
12:24 13        Q  My question is when you wrote up your
12:24 14    statement were you told that it was because CCA wanted
12:24 15    to move Warden Douglas --
12:24 16        A  Oh, no, they didn't tell me anything that
12:24 17    was going on.  They just asked me had I seen or had I
12:24 18    heard any I guess behavior that didn't seem like it
12:24 19    was, you know, I guess to be conducted at work as far
12:24 20    as Warden Douglas was concerned.  I had already
12:24 21    previously wrote statements in regard to Warden
12:24 22    Douglas's behavior pertaining to me as far as him

Page 51

12:24  1    harassing me and being hostile towards me.  So I
12:24  2    thought maybe that's what it had to do with at first.
12:24  3    You know, I didn't know, I just told them everything I
12:24  4    knew.
12:24  5        Q  So you don't know why Warden Douglas is no
12:24  6    longer at the CCA --
12:24  7        A  Oh, no, I know why.  I know why now, because
12:24  8    he was living with a subordinate employee and dating
12:24  9    her, and you are not supposed to do that.
12:24 10        Q  And who told you that that was why?
12:24 11        A  I don't remember, may -- a staff person or
12:24 12    something.  A staff person, on the same level as me, a
12:25 13    subordinate staff member.
12:25 14            COURT REPORTER:  You need to wait until she
12:25 15    finishes the question.
12:25 16            THE WITNESS:  Oh, I didn't, I'm sorry.
12:25 17    Okay.
12:25 18            COURT REPORTER:  It just makes it smoother.
12:25 19            THE WITNESS:  Okay, I'm sorry.
12:25 20    BY MS. DAVIS:
12:25 21        Q  Do you know Sherri Saluga?
12:25 22        A  Saluga?  Yes.

Page 52

12:25  1        Q  Was she your supervisor?
12:25  2        A  No.  She wasn't a supervisor.
12:25  3        Q  What was her position?
12:25  4        A  Quality Assurance Manager.
12:25  5        Q  So she was in management at CCA?
12:25  6        A  She was Quality Assurance Manager.
12:25  7        Q  Do you know if she was in management at CCA?
12:25  8        A  Well, I mean her title says manager, so...
12:25  9        Q  But you don't know for sure?
12:25 10        A  No, I don't understand your question.  I'm
12:25 11    not saying I don't know, but rephrase it so maybe I
12:25 12    can give you a better answer.
12:25 13        Q  I asked you if she was in management at CCA?
12:26 14        A  Sherri Saluga was Quality Assurance Manager.
12:26 15    So anyone who has the title manager behind their name
12:26 16    I believe is management.
12:26 17        Q  When you started working at CCA did you
12:26 18    receive any type of orientation?
12:26 19        A  Yes.
12:26 20        Q  What was involved in the orientation?
12:26 21        A  Everything.  I mean you want me to go
12:26 22    specifically?

Page 53

12:26  1        Q  Yes, please.
12:26  2        A  It was more -- my orientation -- okay, I'm
12:26  3    -- can you rephrase that question?  Because there were
12:26  4    two different types of things I had to go through in
12:26  5    order to be employed at CCA.  So you mean orientation
12:26  6    as far as my immediate supervisor was concerned, or do
12:26  7    you mean as far as just becoming an employee of
12:27  8    Corrections Corporation?
12:27  9        Q  Well, let's take them one by one.
12:27 10        A  Okay.
12:27 11        Q  Did you receive any type of orientation
12:27 12    about working at CCA?
12:27 13        A  Yes.
12:27 14        Q  What was involved in that orientation?
12:27 15        A  Just classes, exercises, learning about
12:27 16    working in a jail, and how to deal with inmates, and
12:27 17    stuff like that.
12:27 18        Q  Did you learn about CCA's policies?
12:27 19        A  They -- they -- at CCA when you had an
12:27 20    instructor to come in, sometimes the instructors
12:27 21    didn't come in, sometimes they didn't show up,
12:27 22    sometimes they had other staff -- other meetings or

14 (Pages 50 to 53)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 54

12:27 1    other things to do, so it was limited, very limited.
12:27 2        Q    Did you receive any orientation when you
12:27 3    started working at CCA --
12:27 4        A    Very limited.
12:27 5        Q    You need to allow me to finish asking my
12:27 6    question.
12:27 7        A    I thought you were finished.
12:27 8        Q    Don't assume that you know what I am asking.
12:27 9            Did you receive any orientation at CCA about
12:27 10    its policies and procedures?
12:28 11        A    Very limited.
12:28 12        Q    What did you learn about the policies and
12:28 13    procedures?
12:28 14        A    Who was your immediate supervisor, learned
12:28 15    about chain of command, policies and procedures,
12:28 16    learned about how they wanted you to write documents
12:28 17    if you ever had to like write an inmate up on a grie-
12:28 18    -- on a, you know, a paper. That's all I can recall.
12:28 19        Q    Did you learn if CCA had a harassment or
12:28 20    anti-harassment policy?
12:28 21        A    Not that I recall. I don't recall them even
12:28 22    really discussing that.

Page 55

12:28 1        Q    Did you learn if CCA had an equal employment
12:28 2    opportunity policy?
12:29 3        A    They di -- they didn't come in and talk
12:29 4    about stuff like that.
12:29 5        Q    They didn't provide any information to
12:29 6    you about --
12:29 7        A    They might have provi -- they might have
12:29 8    provided I think everybody with like a, maybe a packet
12:29 9    or something like that when you first started the
12:29 10    class, but they didn't I don't think verbally discuss
12:29 11    a lot of that kind of stuff. As far as equal
12:29 12    employment is concerned, I don't recall. I don't
12:29 13    know. I don't know.
12:29 14        Q    Did you receive anything in writing from CCA
12:29 15    about harassment or anti-harassment?
12:29 16        A    Not that I recall, but I know they had a
12:29 17    whole packet of like I guess a schedule to follow I
12:29 18    would say how they put it, like -- I don't want to say
12:29 19    guidelines, but, you know, day-to-day what we would be
12:29 20    doing.
12:29 21        Q    Did you receive anything in writing from CCA
12:29 22    about its Family Medical Leave policy?

Page 56

12:29 1        A    Huh-uh. Oh, possibly. Yeah, possibly
12:29 2    Family Medical Leave. I think I remember that.
12:29 3        Q    Why do you remember that?
12:29 4        A    No, I just think I remember when you -- I
12:29 5    think it's something that you had to sign for.
12:29 6    Certain things you had to sign for, I think I remember
12:29 7    that. I think you had to -- certain -- certain
12:30 8    policies or something, I think the Warden had passed a
12:30 9    rule certain things you had to sign for. So maybe
12:30 10    that's one that I -- that stuck out. Because it had
12:30 11    to go to a different department, it had to go to
12:30 12    Personnel or something like that.
12:30 13            (Deposition Exhibit Number 6
12:30 14            was marked for identification.)
12:30 15        Q    I'm showing you what's been marked as
12:30 16    Jackson Exhibit Number 6. Do you recall seeing that
12:30 17    document before?
12:30 18        A    Vaguely, but I -- I -- my name is on it and
12:30 19    I signed it, so I saw it.
12:30 20        Q    So that's your signature on there?
12:30 21        A    Yeah, it is.
12:31 22        Q    And can you tell me what this document is?

Page 57

12:31 1        A    It says Dress and Grooming Standards.
12:31 2        Q    Does this refresh your recollection if you
12:31 3    received information about CCA's Uniform, Dress and
12:31 4    Grooming Standards?
12:31 5        A    Like I said, the information was limited on
12:31 6    all of those topics, but yes.
12:31 7        Q    Yes, it does refresh your recollection that
12:31 8    you received that policy?
12:31 9        A    Yes.
12:31 10            (Deposition Exhibit Number 7
12:31 11            was marked for identification.)
12:31 12        Q    I'm showing you what's been marked as
12:31 13    Exhibit Number 7. Do you recognize that document?
12:31 14        A    I do.
12:31 15        Q    Is that your signature?
12:31 16        A    It is.
12:31 17        Q    And can you tell me what this document
12:31 18    relates to?
12:31 19        A    Alcohol and Drug Acknowledgment form is what
12:32 20    it says.
12:32 21        Q    Do you recall receiving information about
12:32 22    CCA's Drug and Alcohol Program?

15 (Pages 54 to 57)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 58

12:32 1    A    The information that they gave us was very
12:32 2    limited, but I do recall them discussing a certain
12:32 3    like again I will say a realm of information, but just
12:32 4    limited information. They didn't go into detail for
12:32 5    anything.
12:32 6    Q    Would you have signed this document if you
12:32 7    had not received a copy of the policy?
12:32 8    A    Received a copy? They didn't normally give
12:32 9    us copies. They just verbalized the class. I don't
12:32 10   remember getting a copy of anything to like take with
12:32 11   me.
12:32 12   Q    So even though you state on here that you
12:32 13   understand the contents and procedures, you never
12:32 14   saw --
12:32 15   A    A lot of the papers that they had they
12:32 16   didn't even want to recopy them.
12:32 17   Q    Again you will have to wait for me to finish
12:32 18   questioning you, and then you can answer.
12:32 19   A    Oh, I'm sorry, I thought I was talking
12:32 20   already. Okay.
12:32 21   Q    No. You had finished and I was asking a
12:32 22   follow-up question.

Page 59

12:32 1    A    Okay. Thank you, that's fine. Okay.
12:32 2    Q    Would you have signed this document without
12:32 3    having received a copy of this policy?
12:33 4    A    I can't answer that question. I don't
12:33 5    understand what you mean by that. Like they give you
12:33 6    a paper like this one that you passed to me, they say
12:33 7    look over it, read it briefly, and give it back to us.
12:33 8    They didn't want to make new copies. So they just
12:33 9    like I guess saving on paper.
12:33 10          (Deposition Exhibit Number 8
12:33 11          was marked for identification.)
12:33 12   Q    Showing you what's been marked as Jackson
12:33 13   Exhibit Number 8, is that your signature?
12:33 14   A    It is.
12:33 15   Q    Do you recall if CCA had a sexual harassment
12:33 16   policy?
12:33 17   A    They do.
12:33 18   Q    Do you recall what the policy was?
12:34 19   A    Meaning -- I don't understand the question.
12:34 20   What it was?
12:34 21   Q    Do you know what the policy at CCA was --
12:34 22   A    What did it --

Page 60

12:34 1    Q    What was your understanding of the policy
12:34 2    regarding sexual harassment at CCA?
12:34 3    A    Um, okay, sexual harassment. Sexual
12:34 4    harassment, period? Sexual harassment you are asking
12:34 5    me about?
12:34 6    Q    Yes.
12:34 7    A    I think -- I remember one thing that stood
12:34 8    out. They showed us -- I don't know if it was -- they
12:34 9    showed us that even if somebody has like a magazine or
12:34 10   a book that may show or like have explicit pictures or
12:34 11   writings could be still considered sexual harassment,
12:34 12   I remember that.
12:34 13   Q    So you recall some discussions when you were
12:34 14   working --
12:34 15   A    Oh, yeah.
12:34 16   Q    -- at CCA about sexual harassment?
12:34 17   A    Oh, yeah.
12:34 18   Q    What about discussions about harassment?
12:34 19   A    Very -- all of them was very limited, but as
12:34 20   far as harassment, I think they said that you have
12:35 21   to -- like if you are ever harassed or something, or
12:35 22   you feel like you have been harassed, you have to --

Page 61

12:35 1    because we have a union, you have to exhaust all union
12:35 2    remedies or something like that, and you have to
12:35 3    follow the chain of command. That's how that
12:35 4    basically went.
12:35 5    Q    What is your understanding of harassment?
12:35 6    A    As far as like a definition you mean?
12:35 7    Q    Yes.
12:35 8    A    To me to be hara -- to me to be harassed is
12:35 9    to be -- it's a big realm of things. I mean I guess
12:35 10   the definition of harassment is to be treated in, I
12:35 11   don't know, a different -- a way that is not legally
12:35 12   acceptable, I don't know, to be treated in a way
12:35 13   that's not, you know, based on policy and procedure.
12:36 14   Q    Earlier you testified that Jackie Smith used
12:36 15   to harass you.
12:36 16   A    Okay.
12:36 17   Q    Why did you consider her conduct toward you
12:36 18   to be harassment?
12:36 19   A    Because she made comments as far as me being
12:36 20   pregnant. She called me at home more than three to
12:36 21   five times a day after I had already given her the
12:36 22   information that I supplied her with, including

16 (Pages 58 to 61)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 62

12:36  1   doctors' notes, and I asked her to please -- she is
12:36  2   stressing me out, please stop calling me over and over
12:36  3   again, I gave you the information, and it's harassing
12:36  4   me, it's stressing me out, please don't call. And she
12:36  5   kept calling, and calling, and calling, demanding me
12:36  6   that you -- you know, you better get in here, I don't
12:36  7   have anybody else to do this work, stuff like that.
12:36  8   Because she used to tell me can you get the fucking --
12:36  9   can I say that? That's how she said it. Okay. Can
12:36 10   I -- can you get the fucking work orders off the
12:36 11   board, and what is this shit. And what else?
12:37 12   Harassing because she -- I told her -- she used to,
12:37 13   okay, go and get her hair done at a certain time and
12:37 14   date on CCA's time on the clock, and I used to tell
12:37 15   her I can't cover for you, and I'm scared to do that,
12:37 16   and that's not ethical, and she told me I better do it
12:37 17   or I'm going to be out of my position. That to me was
12:37 18   harassment.
12:37 19        She also used to work over at the D.C. Jail
12:37 20   on CCA's clock time and used to -- there was a guy
12:37 21   named Mr. Dukes over at the jail, and she used to have
12:37 22   to pass documents and x-ray films from earlier that

Page 63

12:37  1   morning when she went in to film inmates over at the
12:37  2   jail, pass them through -- in the Maintenance
12:37  3   Department we have a maintenance shop, we have
12:37  4   offices, and then we have a back door that has a gate
12:37  5   that leads directly out to the street. That door has
12:37  6   a master key lock. She is not supposed to have that
12:37  7   key. The Warden don't even have the key. And she
12:37  8   used to try to make me open that door and open the
12:37  9   second door with the key and go pass him these
12:37 10   documents, and when I refused, she really started to
12:38 11   harass me.
12:38 12        Q   Why do you think that Ms. Smith was
12:38 13   harassing you?
12:38 14        A   Based on all the things that I just told
12:38 15   you.
12:38 16        Q   Because you refused to unlock the door?
12:38 17        A   It's a lot of things, because -- it's a lot
12:38 18   of things. Because I had been ill she was harassing
12:38 19   me, based on my pregnancy she was harassing me. She
12:38 20   was harassing me based I believe on my gender because
12:38 21   she said she didn't like women. She was harassing me
12:38 22   because she was doing things unethical, and the Warden

Page 64

12:38  1   would call and say, hey, where is Jackie, and I would
12:38  2   say, um, I think she is upstairs, isn't she coming
12:38  3   towards you; that's what she would tell me. And then
12:38  4   when I didn't know, he is looking at me like why you
12:38  5   can't answer this. And then when I call her, because
12:38  6   she had like a phone or whatever, or a pager, it was
12:38  7   something back then she had, when I would call her,
12:38  8   she like, just cover for me, I'm going to get my hair
12:38  9   done, girl. And I was like, well, that's not what I
12:38 10   am supposed to do, that's not in my job description,
12:38 11   that's not in the realm of my employment here at CCA,
12:38 12   and I would refuse to do it.
12:38 13        Q   Is Jackie Smith the reason why you are no
12:38 14   longer employed at CCA?
12:38 15        A   No.
12:38 16        Q   Why are you no longer employed at CCA?
12:39 17        A   Because I was being, to my belief, how I
12:39 18   felt, harassed, I was placed in a hostile work
12:39 19   environment and discriminated against based on my
12:39 20   illness.
12:39 21        Q   What illness?
12:39 22        A   Panic attacks.

Page 65

12:39  1        Q   And why do you think your panic attacks had
12:39  2   something to do with your reason for no longer being
12:39  3   at CCA?
12:39  4        A   Why do I think? I don't understand that
12:39  5   question why do I think.
12:39  6        Q   Well, you gave a list of reasons --
12:39  7        A   Uh-huh.
12:39  8        Q   -- of why you were not here, and you said it
12:39  9   was because of your illness.
12:39 10        A   I said a lot of things, also because of my
12:39 11   illness.
12:39 12        Q   And the illness you said was panic attacks.
12:39 13        A   And they stemmed -- yes.
12:39 14        Q   And so why do you believe that the panic
12:39 15   attacks are the reason why your employment was
12:39 16   terminated at CCA?
12:39 17        A   Because after they started harassing me and
12:39 18   treating me in a hostile work environment, they
12:39 19   started treating me different when I began to have
12:39 20   panic attacks. They started treating me different.
12:39 21   They just -- they just -- they started treating me
12:40 22   different. They started talking about it. The

17 (Pages 62 to 65)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 66

12:40  1   Wardens told other subordinate employees about it,
12:40  2   stuff that was supposed to be confidential, and then
12:40  3   those employees in turn used to try to I guess use
12:40  4   that against me and, you know, make comments about it,
12:40  5   and it was embarrassing and belittling, and it was
12:40  6   hurtful, and it caused more attacks.
12:40  7       Q   Did you have panic attacks at work?
12:40  8       A   Yep.
12:40  9       Q   How many panic attacks did you have at work?
12:40 10       A   Several, I can't remember exactly a number.
12:40 11       Q   Was anybody present when you had any of
12:40 12   these panic attacks?
12:40 13       A   Yes.
12:40 14       Q   Who was present?
12:40 15       A   Carson Smith was one person that was present
12:40 16   at one point I had a panic attack. I think Daisy
12:40 17   Graves might have been another person at one point in
12:40 18   time.
12:40 19       COURT REPORTER:  Daisy Graves?
12:40 20       THE WITNESS:  Yes, I'm sorry.  I think I
12:40 21   started to have one one day, and my Union rep was in
12:41 22   the office with me.

Page 67

12:41  1   BY MS. DAVIS:
12:41  2       Q   Who was the Union rep?
12:41  3       A   At the time it was Vaughan, Rochelle
12:41  4   Vaughan.  And then I had one downstairs in the
12:41  5   Maintenance Department prior to me even being moved
12:41  6   upstairs where I actually had a panic attack after
12:41  7   Jackie Smith had said and done some things to me, and
12:41  8   they had to call a code because I had passed out from
12:41  9   the panic attack.
12:41 10       Q   What happens when you have a panic attack?
12:41 11       A   You can become disoriented,
12:41 12   hyperventilate, you have overwhelming -- you have --
12:41 13   you have an overwhelming sense of fear, everything
12:41 14   kind of goes dark.
12:41 15       Q   And what do you do when you get a panic
12:41 16   attack?
12:41 17       A   It's not what I do.  It's not something that
12:41 18   I do.  It is something that is in -- triggers that
12:41 19   happens without my control.
12:42 20       Q   I don't think you understood my question.
12:42 21       A   Okay.
12:42 22       Q   When you have a panic attack how do you deal

Page 68

12:42  1   with it?
12:42  2       A   It's something that almost -- um, you can't
12:42  3   -- you can't deal with it.  It's something that
12:42  4   triggers be -- that's beyond someone's control.  It is
12:42  5   something that just happens and it's something that
12:42  6   just has to pass.
12:42  7       Q   How long does it take for it to pass?
12:42  8       A   Every one was -- has been different.  There
12:42  9   is no specific set time.
12:42 10       Q   Do you have to leave work when you have a
12:42 11   panic attack?
12:42 12       A   Possibly, because you become extremely --
12:42 13   you become extremely exhausted.  You are lightheaded
12:42 14   and you are dizzy.  You just become extreme -- your
12:42 15   body is under distress.
12:42 16       Q   Did you ever request to leave work when you
12:42 17   were at CCA because of a panic attack and been denied
12:42 18   that opportunity?
12:42 19       A   Yes.
12:42 20       Q   When did that happen?
12:42 21       A   I don't remember exact date, but I know it
12:42 22   was by Warden Douglas, Jackie Smith.

Page 69

12:43  1       Q   Any other time?
12:43  2       A   Well, those were the only two people who I
12:43  3   ever had contact with, you know, as far as supervisor
12:43  4   wise that denied me.  There were several occasions.
12:43  5       Q   There were several occasions that they
12:43  6   denied you the opportunity to leave work?
12:43  7       A   Jackie Smith was one time.  Warden Douglas
12:43  8   was on several occasions he denied me to leave.
12:43  9       Q   After Warden Douglas was no longer at CCA
12:43 10   did you ever request to leave because of a panic
12:43 11   attack?
12:43 12       A   By War -- by way of Warden King I believe,
12:43 13   Denise King was the person who -- I believe Denise
12:43 14   King was the person who was taking charge.  So, yes, I
12:43 15   asked to leave.
12:43 16       Q   And did she allow you to leave?
12:43 17       A   I believe so.  I think she told me to go to
12:43 18   Warden Figueroa, and he told me to go home, go to the
12:44 19   doctor and stuff.
12:44 20       Q   On how many occasions were you pregnant
12:44 21   during you employment with CCA?
12:44 22       A   One.

18 (Pages 66 to 69)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 70

12:44  1     Q   And that was with your child who is eight
12:44  2   years old now?
12:44  3     A   No.
12:44  4     Q   Did you have complications with that
12:44  5   pregnancy?
12:44  6     A   I did.
12:44  7     Q   What were the complications?
12:44  8     A   Miscarriage. Spontaneous abortion is what
12:44  9   they call it when you are so early on, from too
12:44  10  distressed.
12:44  11    Q   Did you have to take off work when you had a
12:44  12  miscarriage?
12:44  13    A   I was off, and Jackie Smith was calling me
12:44  14  every day. That's -- that's when I was talking about
12:44  15  that.
12:44  16    Q   Did you have to take a leave of absence from
12:44  17  CCA when you had a miscarriage?
12:44  18    A   I was off. Yes, I was off.
12:45  19    Q   So you when you had the miscarriage you
12:45  20  weren't scheduled to work?
12:45  21    A   I had doctor's documentation that stated I
12:45  22  should be off work, and I supplied that to the

Page 71

12:45  1   employer.
12:45  2        MS. DAVIS: Counsel, I would request that
12:45  3   you instruct your witness to answer my questions. My
12:45  4   question was did she need to take time off when she
12:45  5   had the miscarriage.
12:45  6        THE WITNESS: I thought I answered that.
12:45  7        MS. WHITE: She said yes. She answered it.
12:45  8        MS. DAVIS: No, she did not. That's not --
12:45  9        MS. WHITE: She did.
12:45  10       MS. DAVIS: No, she said --
12:45  11       MS. WHITE: Okay, counsel, look.
12:45  12       MS. DAVIS: No, she said she was -- she said
12:45  13  she was --
12:45  14       MS. WHITE: We are not going to sit and
12:45  15  argue back and forth. We are not in the courtroom
12:45  16  yet. Okay?
12:45  17       MS. DAVIS: We will if -- we will if --
12:45  18       MS. WHITE: No, we will not because we will
12:45  19  walk. Okay? The rules permit us to walk if I believe
12:45  20  you are harassing my client.
12:45  21       MS. DAVIS: Your client --
12:45  22       MS. WHITE: And she is -- she is -- I mean

Page 72

12:45  1   come on, why are you getting so hostile?
12:45  2        MS. DAVIS: I am --
12:45  3        MS. WHITE: You are being hostile.
12:45  4        MS. DAVIS: I am not --
12:45  5        MS. WHITE: Your tone, I have sat here and I
12:45  6   have listened to how you approach her, and I said you
12:45  7   know what, I'm not going to say anything. She is
12:45  8   trying to answer you. Why wouldn't she want to answer
12:45  9   you?
12:45  10       MS. DAVIS: And I'm trying to be as helpful
12:45  11  to her and clarify my question.
12:45  12       MS. WHITE: Well, you need to stop. Your
12:45  13  tone is very bad. It really is. It's not respectful.
12:45  14       MS. DAVIS: I'm sorry that you don't like my
12:46  15  tone.
12:46  16       MS. WHITE: And she answered the question,
12:46  17  okay?
12:46  18       MS. DAVIS: No, she didn't --
12:46  19       MS. WHITE: Maybe you didn't understand it.
12:46  20  Maybe you weren't listening. Maybe you weren't
12:46  21  comprehending. She said yes, I did need to take --
12:46  22       MS. DAVIS: Let's take --

Page 73

12:46  1        MS. WHITE: -- I took leave --
12:46  2        MS. DAVIS: Well, we will take a break, and
12:46  3   I think we will call the Judge.
12:46  4        MS. WHITE: Right. We need to -- we need
12:46  5   to leave -- we need to look at that tape and see what
12:46  6   she answered.
12:46  7        THE WITNESS: Yeah.
12:46  8        MS. DAVIS: Or listen to it.
12:46  9        MS. DAVIS: Okay. Can you read that part
12:46  10  back?
12:46  11       MS. WHITE: Oh, no, we can call the Judge
12:46  12  too.
12:46  13       MS. DAVIS: Can you please read back the
12:46  14  question, Ms. Spear?
12:46  15       COURT REPORTER: The question? You want the
12:46  16  question?
12:46  17       MS. DAVIS: The last two questions.
12:46  18       MS. WHITE: No, her answers. We want to
12:46  19  read back her answers, what she had said.
12:46  20       MS. DAVIS: Well, we need the questions and
12:46  21  the answers --
12:46  22       MS. WHITE: Okay.

19 (Pages 70 to 73)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 74

12:46  1      MS. DAVIS: -- so you will see why I asked
12:46  2   for further clarification.
12:47  3      MS. WHITE: I'm shocked.
12:47  4      THE WITNESS: Yeah, because I did answer to
12:47  5   the best of my ability. So I don't know --
12:47  6      (Whereupon, the reporter read the record as
12:47  7      requested.)
12:46  8      MS. DAVIS: My question is I'm trying to
12:47  9   find out if on the time that she was off for
12:47  10  miscarriage she was already scheduled to be off
12:47  11  because it was a day off or a vacation day, or did she
12:47  12  take a leave of absence.
12:47  13     THE WITNESS: Oh, well, she didn't state
12:47  14  that.
12:47  15     MS. WHITE: She answered the question, I
12:47  16  mean come on.
12:47  17     THE WITNESS: I answered -- yeah, I answered
12:47  18  your question to the best of my knowledge, but you
12:47  19  didn't state --
12:47  20     MS. WHITE: And that's all what she is
12:47  21  supposed to do -- that's what the rules say, she
12:47  22  answers to the best of her -- you cannot get a

Page 75

12:47  1   particular answer, okay.
12:47  2      MS. DAVIS: I'm not look --
12:47  3      MS. WHITE: You are only --
12:47  4      MS. DAVIS: I am --
12:47  5      MS. WHITE: You are stuck with what she
12:47  6   gives you, bottom line, that's what the rules say.
12:47  7      THE WITNESS: And you didn't ask about
12:47  8   vacation time or scheduled time off. I didn't know
12:47  9   that's what you meant. You said --
12:47  10     MS. WHITE: I think you have answered the
12:48  11  question. I mean I know, I know the answer.
12:48  12     THE WITNESS: If -- I answered the question
12:48  13  that you stated. If you would have asked about
12:48  14  vacation time, I would have specifically said it was
12:48  15  not vacation or it was or wasn't.
12:48  16  BY MS. DAVIS:
12:48  17     Q   Well, if your attorney would allow me to try
12:48  18  and clarify, because I am trying to understand,
12:48  19  because I don't want any confusion --
12:48  20     A   Sure.
12:48  21     Q   -- on the record either.
12:48  22     A   Absolutely.

Page 76

12:48  1      Q   So I'm just trying to find out what your
12:48  2   status was at the time that you had the miscarriage.
12:48  3   Did you have it on a day that you were scheduled off
12:48  4   already, or did you have to call in and take time off
12:48  5   is the question?
12:48  6      A   I had to call in to take time off.
12:48  7      Q   Thank you very much.
12:48  8      A   Thank you for clarifying.
12:48  9      Q   Well, if your attorney would have allowed me
12:48  10  to finish --
12:48  11     MS. WHITE: No, no, don't try to put me in
12:48  12  it now. Okay? You started with the ho-ho-harade.
12:48  13     THE WITNESS: Yeah, I don't think it had --
12:48  14     MS. DAVIS: Why don't we take a break now.
12:48  15     THE WITNESS: Okay.
12:48  16     MS. DAVIS: Why don't we take about half an
12:48  17  hour, and maybe the witness and her attorney can pull
12:48  18  themselves together, and we will proceed.
12:49  19     THE WITNESS: I'm saying my daughter is ill,
12:49  20  and I, you know --
12:49  21     MS. WHITE: We will just have to reschedule
12:49  22  so you can get your seven hours in another time

Page 77

12:49  1   because we are leaving here at two o'clock.
12:49  2      MS. DAVIS: I am showing you what has been
12:49  3   marked as Exhibit Number 1. Have you seen that
12:49  4   document?
12:49  5      MS. WHITE: Yes, she has, and the bottom
12:49  6   line is that it states ongoing, and she knows, we have
12:49  7   talked about that, but -- and we had expected to, but
12:49  8   her daughter is sick, sick, so --
12:49  9      MS. DAVIS: You see this Notice of
12:49  10  Deposition, and it was scheduled to start at 10 a.m.
12:49  11     THE WITNESS: Uh-huh.
12:49  12     MS. DAVIS: And what time did you arrive
12:49  13  today?
12:49  14     MS. WHITE: And I called and said that we
12:49  15  were coming late because we were up in traffic. There
12:49  16  was an accident and we had --
12:49  17     THE WITNESS: Exactly.
12:49  18     MS. WHITE: And there was a lot of traffic.
12:49  19     THE WITNESS: Exactly.
12:49  20     MS. WHITE: Okay?
12:49  21     THE WITNESS: And that's beyond our control,
12:49  22  inclement weather and traffic is beyond our control.

20 (Pages 74 to 77)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 78

| | | |
|---|---|---|
| 12:50 | 1 | MS. WHITE: And in D.C. |
| 12:50 | 2 | THE WITNESS: And we called to communicate |
| 12:50 | 3 | that to you. |
| 12:50 | 4 | MS. DAVIS: Yes, and I understand, and |
| 12:50 | 5 | unfortunately I do get seven hours. This was |
| 12:50 | 6 | rescheduled before, it was previously scheduled, and |
| 12:50 | 7 | you did arrive late, and I am trying to get through |
| 12:50 | 8 | this as quickly as possible, but if you and your |
| 12:50 | 9 | attorney will -- |
| 12:50 | 10 | MS. WHITE: Well, we don't have to -- I'm |
| 12:50 | 11 | not going -- |
| 12:50 | 12 | MS. DAVIS: -- if you will cooperate with |
| 12:50 | 13 | me, we will get through this and you will be out of |
| 12:50 | 14 | here. |
| 12:50 | 15 | THE WITNESS: Oh, no. Oh, no. Oh, no, but |
| 12:50 | 16 | I'm -- but no -- but no -- |
| 12:50 | 17 | MS. DAVIS: Thank you very much. |
| 12:50 | 18 | THE WITNESS: I'm sorry, I'm cooperating |
| 12:50 | 19 | fully. I don't want -- |
| 12:50 | 20 | MS. WHITE: Okay, come on. |
| 12:50 | 21 | THE WITNESS: No, I just don't want her to |
| 12:50 | 22 | say -- |

Page 79

| | | |
|---|---|---|
| 12:50 | 1 | MS. WHITE: Renita. Renita. Renita, don't |
| 12:50 | 2 | you -- |
| 12:50 | 3 | THE WITNESS: Oh, no, no. |
| 12:50 | 4 | MS. WHITE: No, ad-libs. |
| 12:50 | 5 | (Whereupon, there was a lunch recess.) |
| 13:18 | 6 | (Deposition Exhibit Number 9 |
| 13:18 | 7 | was marked for identification.) |
| 13:18 | 8 | BY MS. DAVIS: |
| 13:18 | 9 | Q Ms. Jackson, I would like you to take a look |
| 13:18 | 10 | again at Exhibit Number 5, which are your responses to |
| 13:18 | 11 | CCA's first set of interrogatories, and specifically I |
| 13:18 | 12 | would like you to take a look on page 3 at number 4. |
| 13:18 | 13 | And if you want to take a second and read through it, |
| 13:19 | 14 | I will then ask you my question. |
| 13:19 | 15 | A (Witness reviewing document.) |
| 13:19 | 16 | Q Just number 4. |
| 13:19 | 17 | A Oh. |
| 13:19 | 18 | Q That's the only one you needed to read. |
| 13:19 | 19 | A Well, no, this is all -- I guess -- I |
| 13:19 | 20 | thought this was all considered to be number 4 on both |
| 13:19 | 21 | pages. |
| 13:19 | 22 | Q Right, stop -- I thought I saw your finger |

Page 80

| | | |
|---|---|---|
| 13:19 | 1 | going to number 5, that's why I said that. |
| 13:20 | 2 | A Oh, no, no. I'm not finished reading number |
| 13:20 | 3 | 4. Can I finish? |
| 13:20 | 4 | Q Okay. Yes. |
| 13:20 | 5 | A Thank you. |
| 13:20 | 6 | Q Please do. |
| 13:20 | 7 | A Thank you. |
| 13:20 | 8 | Q Now, I would like you to take a look at what |
| 13:20 | 9 | has been marked as Jackson Exhibit Number 9. |
| 13:20 | 10 | A Okay. |
| 13:20 | 11 | Q Going back to Exhibit Number 5 and your |
| 13:20 | 12 | first response which -- |
| 13:20 | 13 | A Oh, Number 5? |
| 13:20 | 14 | Q Exhibit Number 5, which is -- |
| 13:20 | 15 | A Okay. |
| 13:20 | 16 | Q No, it's that one. |
| 13:20 | 17 | A Okay. |
| 13:20 | 18 | Q Right here, but still at question number 4 |
| 13:20 | 19 | that you just read. |
| 13:20 | 20 | A Okay. |
| 13:20 | 21 | Q Looking at the first paragraph of your |
| 13:21 | 22 | response which talks about complaints that you made |

Page 81

| | | |
|---|---|---|
| 13:21 | 1 | about Jackie Smith? |
| 13:21 | 2 | A Okay. |
| 13:21 | 3 | Q And also that you wrote incident reports |
| 13:21 | 4 | about Warden Douglas, and it references Exhibit A, |
| 13:21 | 5 | which is Exhibit Number 9, the other exhibit. |
| 13:21 | 6 | A Okay. |
| 13:21 | 7 | Q You can take a look at Exhibit Number 9 and |
| 13:21 | 8 | let me know if those are the written statements or |
| 13:21 | 9 | complaints that you made about Jackie Smith and Warden |
| 13:21 | 10 | Douglas. |
| 13:22 | 11 | A Okay, so what was your question again? I'm |
| 13:22 | 12 | sorry. |
| 13:22 | 13 | Q My question is that if those documents that |
| 13:22 | 14 | are part of Exhibit Number 9 are your written |
| 13:22 | 15 | complaints about Warden Douglas and Jackie Smith? |
| 13:23 | 16 | A Some of them, not all of them. |
| 13:23 | 17 | Q Are there any additional written statements |
| 13:23 | 18 | that you have in your possession that are not in |
| 13:23 | 19 | Exhibit Number 9? |
| 13:23 | 20 | A Um, I don't know. When you say possession, |
| 13:23 | 21 | you mean today? |
| 13:23 | 22 | Q Today, or at home -- |

21 (Pages 78 to 81)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 82

13:23  1      A    Okay, let me just --
13:23  2      Q    -- or anywhere else.
13:23  3      A    Okay, I just wanted to clarify.  Thank you.
13:23  4      Q    Ms. Jackson, I believe I earlier advised you
13:23  5  not to look at any documents that you brought with you
13:23  6  today.
13:23  7      A    Oh, no, when you just said -- made the
13:23  8  statement and said do you have any other documents, I
13:23  9  thought you were telling me to look to see if I had --
13:23  10  that's why I asked at home or here today, and you said
13:23  11  either here today or at home.
13:23  12      Q    Before you look through the pile, do you
13:24  13  believe that you have any other documents --
13:24  14      A    Oh.
13:24  15      Q    -- that are not in that Exhibit Number 9?
13:24  16      A    Oh, okay, thank you for clarifying.
13:24  17  Possibly, yes, because this is only one, it's really
13:24  18  long, and then -- yes, I do.
13:24  19      Q    There are additional documents that are not
13:24  20  in exhibit --
13:24  21      A    To -- to my -- to my know -- to my
13:24  22  knowledge, yes, because this is -- yes, I wrote lots

Page 83

13:24  1  of stuff as far as the harassing -- harassment I was
13:24  2  under, to my knowledge.
13:24  3      Q    Okay.  Now, you brought with you today a
13:24  4  packet of documents.  Do you think that the documents
13:24  5  that you say are other complaints about Jackie Smith
13:24  6  or Warden Douglas are in those documents?
13:24  7      A    I don't know, that's why I was going to --
13:24  8      Q    Well, do you think they might be in those
13:24  9  documents?
13:24  10      A    I don't know.  It could be a possibility,
13:24  11  but I don't know.
13:24  12      Q    Well, I want to give you the opportunity --
13:24  13      A    Oh.
13:24  14      Q    -- to look at the documents.
13:24  15      A    Oh, okay, thank you.  Okay.
13:25  16          Can I ask my counsel a question?
13:25  17      Q    Not while there is a question pending.
13:25  18      A    Which question is pending?
13:25  19      Q    My question was if there were other
13:25  20  documents in the documents that you brought today --
13:25  21      A    Oh.
13:25  22      Q    -- that relate to Jackie Smith or Warden

Page 84

13:25  1  Douglas.
13:25  2      A    Yes.
13:25  3      Q    Okay.  What document is that?
13:25  4      A    I answered the question.  Now can I ask my
13:25  5  counsel a question?
13:25  6      Q    No, you can't --
13:25  7      A    No?
13:25  8      Q    -- ask her a question.
13:25  9      A    Oh, okay.
13:25  10      Q    What document do you have --
13:25  11      A    Um --
13:25  12      Q    -- that is not in Exhibit 9 that you say
13:25  13  relates to either Jackie Smith or Warden Douglas?
13:25  14      A    It's dated April the 14th, 2004, regarding
13:25  15  Warden Douglas.
13:26  16      Q    Could I please see that document?
13:26  17      A    Do we have a paper clip remover here?
13:26  18      Q    Right here, I'm sorry.
13:26  19      A    Oh, thank you.  Thank you.
13:27  20      Q    Okay.  I believe your attorney has provided
13:27  21  us with this document already.  It's not part of
13:27  22  Exhibit A, but you said that this also is a written

Page 85

13:27  1  complaint about Warden Douglas, just so I understand?
13:27  2      A    It is.
13:27  3      Q    Okay.  So I will include that among those
13:27  4  documents.
13:27  5      MS. WHITE:  We need to -- we need to get a
13:27  6  copy of that, because I don't -- I don't know --
13:27  7      MS. DAVIS:  Yes, that's what I am going to
13:27  8  do.  I realized she didn't bring any copies with her.
13:27  9      MS. WHITE:  No.
13:27  10      MS. DAVIS:  Do you mind if we mark it?
13:28  11      MS. WHITE:  You can go on and mark it if you
13:28  12  like because I can be able to refer to it when I get
13:28  13  the record.  Yeah, you can go ahead and mark it and we
13:28  14  can get a copy of it.
13:28  15          (Deposition Exhibit Number 9A
13:28  16          was marked for identification.)
13:28  17      THE WITNESS:  Can I see that document again
13:28  18  real quick, just for a second?
13:28  19          Okay, I have a copy.
13:28  20      MS. DAVIS:  Okay, you have a copy.  So we
13:28  21  will put this with the transcript.
13:28  22  BY MS. DAVIS:

22 (Pages 82 to 85)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 86

13:28 1    Q   Now, going back to Exhibit Number 9, the
13:28 2  first document --
13:28 3    A   I have a question.  I just closed it up.
13:28 4  Can I pull my other document out that matches that if
13:28 5  you are going to refer to it at all, or should I leave
13:28 6  it --
13:28 7    Q   I may or may not refer to it again, but I
13:28 8  want you to go back to this other exhibit.
13:29 9    A   Oh, okay.
13:29 10   Q   I'm not going to ask you questions about
13:29 11 what you just gave me right now.
13:29 12   A   Okay.
13:29 13   Q   Just look at this Exhibit Number 9.
13:29 14   A   I just want to make sure so that before I
13:29 15 get a chance I can go back into this folder without --
13:29 16   Q   Oh, yes.
13:29 17   A   I don't want to be a -- okay.
13:29 18   Q   And we will get you copies.
13:29 19   A   Okay.
13:29 20   Q   Don't worry about it.
13:29 21   A   All right.
13:29 22   Q   I won't --

Page 87

13:29 1    A   Okay.
13:29 2    Q   I'm not trying to trick you or anything.  If
13:29 3  you need to look at a document, I will provide it to
13:29 4  you.
13:29 5        Okay, so going back to Exhibit Number 9,
13:29 6  okay?
13:29 7    A   Okay.
13:29 8    Q   Go to the front of the exhibit, the first
13:29 9  document.  Now, earlier you testified that you made a
13:29 10 written complaint about Jackie Smith that resulted in
13:29 11 you requesting to be moved.
13:29 12   A   Okay.
13:29 13   Q   Is this the complaint that you made?
13:29 14   A   It is.
13:29 15   Q   And then at the top of that first page of
13:29 16 Exhibit Number 9 there is some handwriting to the
13:29 17 right-hand side.
13:29 18   A   Okay.
13:29 19   Q   Is that your handwriting?
13:29 20   A   It is.
13:29 21   Q   And did you make those notes on this memo on
13:29 22 March 3rd, 2003?

Page 88

13:29 1    A   No.  Actually CCA denied my unemployment
13:30 2  benefits, and at that time I didn't have, you know, a
13:30 3  job or a lot of resources, so I had to use this only
13:30 4  copy to write on to I guess let the person know what I
13:30 5  was trying to, um, to, um, you know, say, and they
13:30 6  also told me to just initial it, you know, that I
13:30 7  wrote something on the side.
13:30 8    Q   So Warden Figueroa, to whom this memo is
13:30 9  addressed, --
13:30 10   A   Uh-huh.
13:30 11   Q   -- didn't see these notations?
13:30 12   A   No, that went to Unemployment Commission.
13:30 13   Q   And going to the last page of that same memo
13:30 14 it's one, two, three, the fourth page.
13:30 15   A   Going to the last page or the fourth page?
13:30 16   Q   The last page of that memo.
13:30 17   A   Okay.
13:30 18   Q   Which is the fourth page.
13:30 19   A   Okay.
13:30 20   Q   I'm just trying to help you --
13:30 21   A   No, no, thank you.
13:30 22   Q   -- flip through.

Page 89

13:30 1    A   Okay.
13:30 2    Q   Keep going.  Oh, I'm sorry, one more page.
13:31 3    A   Okay.  Okay.
13:31 4    Q   Again there is handwriting on that page, is
13:31 5  that your handwriting?
13:31 6    A   It is.
13:31 7    Q   And was that written on the original memo
13:31 8  that went to Warden Figueroa?
13:31 9    A   No.
13:31 10   Q   Did that go as well to Unemployment?
13:31 11   A   Unemploy -- this whole pack -- yeah, this
13:31 12 whole -- this whole thing here, yes.
13:31 13   Q   So all of what has been marked as Exhibit
13:31 14 Number 9 went to Unemployment?
13:31 15   A   All -- I'm not going to say all because I
13:31 16 haven't looked through the whole pack yet, but what I
13:31 17 have seen thus far has.
13:31 18   Q   Okay.
13:31 19   A   And a lot of other stuff here probably could
13:31 20 if it has any side notations.
13:31 21   Q   Okay.  I just want to make sure I understand
13:31 22 what I am looking at.

23 (Pages 86 to 89)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 90

13:31 1     A    Absolutely.
13:31 2     Q    Flipping to the next statement, --
13:31 3     A    Okay.
13:31 4     Q    -- which is dated May 12, 2004.
13:31 5     A    Okay.
13:31 6     Q    Again on the second page there is
13:31 7    handwriting?
13:31 8     A    Uh-huh.
13:31 9     Q    And that is your handwriting again?
13:32 10    A    It is.
13:32 11    Q    And these are notes that you made for
13:32 12   Unemployment?
13:32 13    A    It is, and I think I have my signature again
13:32 14   here at the bottom, and I put date submitted to, and
13:32 15   it's something cut off here, but I put the date that I
13:32 16   had signed that.  Do you understand what I am saying?
13:32 17    Q    Yes.
13:32 18    A    Okay.
13:32 19    Q    If you will turn four pages in to the
13:32 20   incident statement dated July 8th, 2004.
13:32 21    A    Okay.
13:32 22    Q    At the top of that document beside "Based On

Page 91

13:32 1    Your Own knowledge," there is a notation that says --
13:32 2    well, can you read the notation, because I can't read
13:32 3    the handwriting.
13:32 4     A    It says before my termination.
13:32 5     Q    And again that note was made for
13:32 6    unemployment --
13:32 7     A    For unemployment services.
13:33 8     Q    Okay, continuing on to the memo that's dated
13:33 9    July 19th, 2004, it's addressed to Fred Figueroa,
13:33 10   captioned disrespectful, unprofessional behavior.
13:33 11   Keep going towards the back.
13:33 12    A    Oh, wait a minute.  Which date is it again?
13:33 13    Q    July 19th.
13:33 14    A    Okay.
13:33 15    Q    If you would take a look at --
13:33 16        Counsel, I would ask that you again not
13:33 17   coach the witness while I'm asking --
13:33 18        MS. WHITE:  I'm not coaching her.  Okay?
13:33 19   And I would like to put on the record that you are --
13:33 20   you are totally misrepresenting my actions here.
13:33 21   Okay?  I'm not coaching her.
13:33 22        THE WITNESS:  She was just showing me this

Page 92

13:33 1    is the document --
13:33 2        MS. WHITE:  She knows what I meant.
13:33 3        THE WITNESS:  -- that you are referring to.
13:33 4        MS. WHITE:  Okay?
13:34 5        MS. DAVIS:  If the witness needs any help, I
13:34 6    will help her.
13:34 7    BY MS. DAVIS:
13:34 8     Q    Now, look at the July 19, 2004 memo.  Could
13:34 9    you take a look at it before I ask you a question?
13:36 10    A    Okay.
13:36 11    Q    Okay.  Just so I understand, you provided
13:36 12   this document in response or in support of your
13:36 13   response about complaining about Jackie Smith and
13:36 14   Warden Douglas, and just so I understand --
13:36 15    A    No, I'm sorry, I don't want to cut you off,
13:36 16   but this has nothing to do with -- this has nothing to
13:36 17   do with Warden Douglas or Jackie.
13:36 18    Q    Okay, that's what I want to clarify.
13:36 19    A    Okay.
13:36 20    Q    Because in the response it said that this
13:36 21   document did.  That's why I wanted to --
13:36 22    A    Well, I mean not directly.  Indirectly is

Page 93

13:36 1    what I am saying.  I mean their names are not
13:36 2    mentioned in this document, but this incident to my
13:36 3    belief happened because of what happened with Warden
13:36 4    Douglas and, you know, Jackie Smith.  That's why it is
13:36 5    included in this.
13:36 6     Q    That was my question.
13:36 7     A    Okay.
13:36 8     Q    Thank you for answering it.
13:36 9        Moving to the next document, it's addressed
13:36 10   to Roosevelt Littlejohn?
13:37 11    A    Okay.
13:37 12    Q    Could you tell me who Roosevelt Littlejohn
13:37 13   is?
13:37 14    A    Um, Union President.
13:37 15    Q    Is he an employee of CCA?
13:37 16    A    I'm not sure.  He was at this time.
13:37 17    Q    At the time that you wrote the memo he was
13:37 18   an employee of CCA?
13:37 19    A    Correct.  Well, I don't even want to say
13:37 20   employee.  I don't know how they do it when you are
13:37 21   President of the Union, you may have to work four
13:37 22   hours or something like that, so...

24 (Pages 90 to 93)

Page 94

13:37 1    Q  Was he a supervisor at CCA?
13:37 2    A  No. I just don't know how -- I can't really
13:37 3  answer that question because when you are a Union
13:37 4  personnel that's like a high chief of personnel, I
13:37 5  don't know if they still consider you to be an
13:37 6  employee, or if you are not, or if you have to come in
13:37 7  and work on the clock, or if you don't, I don't know,
13:37 8  you know, I don't know how that works. I know he was
13:37 9  a Union rep, I mean he was the Union President for all
13:37 10  the employees that worked there who were involved in
13:37 11  the Union.
13:37 12    Q  And why did you send him this memo dated
13:37 13  July 21st, 2004?
13:38 14    A  Can I read the document?
13:38 15    Q  Yes. I thought you had, I'm sorry.
13:38 16    A  Oh, no.
13:38 17     Okay. What was the question again? I'm
13:38 18  sorry.
13:38 19    Q  Why did you send this memo to
13:38 20  Mr. Littlejohn?
13:38 21    A  It was several reasons, but the main reason
13:39 22  is because they refused to allow me to have a Union

Page 95

13:39 1  rep, and based on the Collective Bargaining Agreement
13:39 2  every employee is entitled to a Union representative
13:39 3  if you are going to ask the employee any questions, or
13:39 4  talk about a PSN, or just anything like that, and they
13:39 5  refused to let me have a Union rep, and I thought that
13:39 6  he should know about it.
13:39 7    Q  Had you written any other memos to
13:39 8  Mr. Littlejohn previously?
13:39 9    A  I don't know, not to my knowledge, but a lot
13:39 10  of the times Rochelle Vaughan, who was the Assistant,
13:39 11  she was in the building. So if something happened, I
13:39 12  could go get her, but I don't know if she was there
13:39 13  this day. That's probably why I wrote it.
13:39 14    Q  When you were having problems with Jackie
13:39 15  Smith did you speak to Mr. Littlejohn about the
13:39 16  incidents?
13:39 17    A  I think maybe a couple times he asked me
13:39 18  what was going on briefly I talked to him, but more
13:40 19  than he Rochelle Vaughan and a couple other Union
13:40 20  reps.
13:40 21    Q  Do you remember who the other Union reps
13:40 22  were?

Page 96

13:40 1    A  Carson Smith was one of the Union reps at
13:40 2  the time. That's the only -- Salam I think her name
13:40 3  was, Salam, something like that, I don't know her
13:40 4  first name. In the jail we'd only go by last names,
13:40 5  so I don't know the first name.
13:40 6    Q  And do you recall what you told Ms. Vaughan
13:40 7  about Ms. Smith?
13:40 8    A  A lot. Recall in regards to what aspect
13:40 9  of...
13:40 10    Q  Did you talk to Ms. Vaughan about feeling
13:40 11  harassed by Ms. Smith?
13:40 12    A  Yes.
13:40 13    Q  And what did you tell her?
13:40 14    A  A lot of the stuff that I just told you
13:40 15  today, how she would talk to me in the condescending
13:41 16  way, how she would use curse words at me, how she
13:41 17  tried to force me to do things that were unethical and
13:41 18  to my as far as I am concerned illegal, a lot of
13:41 19  stuff, how I started having panic attacks because
13:41 20  of -- because of the harassment, the situation that
13:41 21  she had placed me under. I don't know, a lot of
13:41 22  stuff.

Page 97

13:41 1    Q  Under the Union contracts with CCA was there
13:41 2  a grievance process?
13:41 3    A  For?
13:41 4    Q  If you were dissatisfied with the way
13:41 5  your --
13:41 6    A  This is -- this -- well, this is -- this --
13:41 7  you have to go through chain of command first. Chain
13:41 8  of command is Warden Figueroa first, and then after
13:41 9  Warden Figueroa you file a grievance. And I believe
13:41 10  that I asked for a grievance to be filed. I don't
13:41 11  know what the outcome of that was. I don't -- I don't
13:41 12  know -- I don't even know -- I don't know what
13:42 13  happened with that, but I know I requested a grievance
13:42 14  be filed after they made the decision from downstairs.
13:42 15    Q  After they made which decision?
13:42 16    A  Like, you know, after I was moved up there
13:42 17  pending the investigation and didn't go back to my job
13:42 18  and didn't go into -- yeah, I just -- I know that
13:42 19  they -- they never passed me anything in my hand that
13:42 20  said no findings, but they verbalized that we had no
13:42 21  findings.
13:42 22    Q  Who verbalized no findings?

25 (Pages 94 to 97)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 98

13:42  1      A   I think it was Warden Figueroa at the time.
13:42  2      Q   And if you were dissatisfied with Warden
13:42  3  Figueroa's findings, was there another option after
13:42  4  that?
13:42  5      A   Well, I know that -- I don't know, but I
13:42  6  know that I requested something else to be done after
13:42  7  there were no findings.  I just don't remember right
13:42  8  now at this time what they said or what -- I don't --
13:42  9  you know, I don't know what I was instructed to do
13:42 10  after that.  I'm not sure if there is -- I know -- I
13:42 11  know Rochelle Vaughan went and talked to him about it,
13:42 12  I know that.
13:42 13      Q   She went to speak to whom?
13:42 14      A   Warden Figueroa.  In regard to the no
13:43 15  findings, I don't know what -- like I said, I don't
13:43 16  know -- again I don't know what the outcome was.  A
13:43 17  lot of times in the jail they try to -- it's almost
13:43 18  like dealing with like an attorney when you are Union
13:43 19  rep.  They try to I guess speak on your behalf and
13:43 20  work something out, and if they can work something
13:43 21  out, come to an agreement without putting paperwork to
13:43 22  it, then sometimes they do that.  So I just think that

Page 99

13:43  1  -- I think -- I don't remember.  I think that the
13:43  2  outcome was that -- I don't remember.  I don't
13:43  3  remember what -- if there was something else filed,
13:43  4  another step, but I know that he tried to, I don't
13:43  5  know, say that the decision has been made and now she
13:43  6  is not down there, so let's just leave it at that,
13:43  7  something like to that extent.
13:43  8      Q   Other than that one discussion that you were
13:43  9  aware of or that you testified to between Rochelle
13:43 10  Vaughan and Warden Figueroa, are you aware of any
13:43 11  other time that the Union spoke to one of the Wardens
13:43 12  or somebody in management at CCA on your behalf?
13:44 13      A   Several times, and I don't know the times
13:44 14  and the dates, but several times.  Every time
13:44 15  something happened, every time something hap -- I used
13:44 16  to keep a diary, a journal, and they were very
13:44 17  offended by that journal because I would write down
13:44 18  the times, and the dates, and the places, and the
13:44 19  people, and what was said to me, and just stuff like
13:44 20  that.  And I remember every time something happened I
13:44 21  would call for a Union rep, every time they began
13:44 22  harassing me I would call for a Union rep, and when a

Page 100

13:44  1  Union rep came, the Union rep would instruct me to
13:44  2  write an incident statement, and these are what --
13:44  3  well, not this one specifically, but -- well, this is
13:44  4  an incident statement -- but all of these are what
13:44  5  those are considered to be like grievance/incident
13:44  6  statements.
13:44  7      Q   You said you kept a journal?
13:44  8      A   (Witness nodded head affirmatively.)
13:44  9      Q   How long did you keep a journal?
13:44 10      A   I don't know, it was almost right before I
13:44 11  got terminated, but it was right after I think Warden
13:44 12  Douglas was gone.
13:44 13      Q   Do you still have that journal?
13:44 14      A   I moved since then twice.  I don't remember
13:44 15  where it is, but maybe I -- I don't know, maybe I can
13:44 16  try to find it.  I don't know where it is.
13:45 17      MS. DAVIS:  We would request that a search
13:45 18  be made for the journal, and if it is found, that it
13:45 19  be provided to us.
13:45 20      MS. WHITE:  Sure.
13:45 21      THE WITNESS:  Oh, yeah.
13:45 22  BY MS. DAVIS:

Page 101

13:45  1      Q   Do you recall how long you were working at
13:45  2  CCA when you became pregnant?
13:45  3      A   I don't recall.
13:45  4      Q   Do you recall if it was less than a year?
13:45  5      A   It was less than a year.
13:45  6      Q   And were you eligible for Family Medical
13:45  7  Leave under CCA's policy if you had worked there for
13:45  8  less than a year?
13:45  9      A   I'm not sure.  I don't know the policies to
13:45 10  a "T" as far as Family Medical Leave is concerned, but
13:45 11  I probably would have been eligible, yes.  Had I not
13:45 12  had a miscarriage, I probably would have been eligible
13:45 13  because I -- you have to carry a baby for almost nine
13:46 14  months, that would -- I would have been there longer
13:46 15  than a year.
13:46 16      Q   Going back to Exhibit Number 5, the
13:46 17  interrogatories.
13:46 18      A   I gave that back, I think.  Oh, this is it?
13:46 19  Oh, okay.  Sorry.
13:46 20      Q   And going to page 7.
13:46 21      A   Okay.
13:46 22      Q   Interrogatory number 9 states --

26 (Pages 98 to 101)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 102

13:46 1      A   Okay.
13:46 2      Q   -- states that you applied for various jobs.
13:47 3   Do you have copies of any job applications that you
13:47 4   completed?
13:47 5      A   I'm sorry, ask that question again.  I was
13:47 6   reading.
13:47 7      Q   Your response to question number 9, the
13:47 8   first sentence says that you applied for various jobs
13:47 9   in attempts to gain meaningful employment.
13:47 10     A   Okay.
13:47 11     Q   My question is do you have copies of any job
13:47 12  applications?
13:47 13     A   No.  They don't normally give you copies of
13:44 14  a job application when you go to apply for a job.  You
13:47 15  just take your resumé in and you sit down and that's
13:47 16  it.
13:47 17     Q   How did you identify places to apply for a
13:47 18  job?
13:47 19     A   I needed to try to support my kids.  I had
13:47 20  -- what do you mean I -- I don't understand the
13:47 21  question, how do you --
13:47 22     Q   How did you decide which employers to send

Page 103

13:47 1   resumés or applications to?
13:47 2      A   I still don't understand that question.  How
13:47 3   did I decide?  I sent them a lot of places.  Meaning
13:47 4   like I wasn't just sending them as administrative
13:47 5   assistant or cler -- I sent them to lot of places so
13:48 6   that I could try to get a job.
13:48 7      Q   Did you send them in response to job
13:48 8   advertisements?
13:48 9      A   Not normally, because those things aren't
13:48 10  real.
13:48 11     Q   So how did you decide where to send your job
13:48 12  applications?
13:48 13     A   It -- I -- some of them I used the internet,
13:48 14  the internet, word of mouth, I think that's it.  I
13:48 15  think maybe one time I might have looked in something
13:48 16  we have called the PennySaver, one time I looked in
13:48 17  that, but that's it.
13:48 18     Q   And what types of positions did you submit
13:48 19  job applications for?
13:48 20     A   I don't remember, it's been a long time.
13:49 21     Q   Do you remember approximately how many job
13:49 22  applications you sent out?

Page 104

13:49 1      A   I don't remember that either, specifically.
13:49 2      Q   The last sentence of your response to
13:49 3   interrogatory 9 says you sought unemployment benefits?
13:49 4      A   Uh-huh.
13:49 5      Q   For how long did you collect unemployment?
13:49 6      A   Well, I -- I didn't.  It -- um, okay, CCA
13:49 7   denied me -- okay, hold on a minute.  Let me start
13:49 8   over, because that's not how it -- CCA had like
13:49 9   wrongfully terminated me.  Then I went to apply for
13:49 10  unemployment, and then they denied to pay the
13:49 11  benefits, and then I had to go to like a mediation or
13:50 12  something, or whatever you call it, to grieve it or
13:50 13  whatever you call it.  Okay, so I did that.  Then by
13:50 14  the time that process was over, you know how a person
13:50 15  would normally receive benefits every week or
13:50 16  biweekly?  I didn't receive like that, I received one
13:50 17  check once I had won that case against CCA.
13:50 18     Q   So you are no longer collecting
13:50 19  unemployment?
13:50 20     A   No.
13:50 21     Q   Do you recall when you received that check?
13:50 22     A   Can I look in this?  I don't know which --

Page 105

13:50 1   I --
13:50 2      Q   If you can't remember, just you can't
13:50 3   remember.
13:50 4      A   Oh, okay, I don't remember exactly, okay.
13:50 5      Q   Again looking at Exhibit Number 5, if you
13:50 6   turn one page back to page 6, --
13:51 7      A   All right.
13:51 8      Q   -- one of the items of damages is financial
13:51 9   loss?
13:51 10     A   Okay.
13:51 11     Q   200,000?
13:51 12     A   Okay.
13:51 13     Q   Can you tell me what comprises or what was
13:51 14  used to reach the 200,000?
13:51 15     A   Based on the fact that I wasn't receiving --
13:51 16  I didn't have a job any more because I had been
13:51 17  wrongfully terminated, and as far as my living and for
13:51 18  me to be able to, I don't want to say better myself,
13:51 19  but for me to be able to have like apartment and
13:51 20  housing, and, you know, just different things that I
13:51 21  would normally have, you know, had I had to like let
13:51 22  certain things go based on my wrongful termination

27 (Pages 102 to 105)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 106

13:51  1  from CCA. Also like financial loss as far as gainful
13:51  2  employment, this is -- it's a lot of things under this
13:51  3  realm.
13:51  4      Q   Well, what comprises the 200,000?
13:51  5      A   A lot -- a lot. Financial loss is -- I
13:52  6  just -- like I just stated, financial loss is not
13:52  7  being able to have the income and having the ability
13:52  8  to advance and, you know, they can't say where I would
13:52  9  have been in that company within a certain amount of
13:52 10  years, so, you know, all of that.
13:52 11      Q   My understanding of lost wages would cover
13:52 12  what you have just described to me, and my
13:52 13  understanding financial loss would be something that
13:52 14  you had to spend that you otherwise would not, money
13:52 15  that you would have to spend.  Is there any money that
13:52 16  you spent because you lost your job at CCA?
13:52 17      A   A lot of it, including attorney's fees.  I
13:52 18  didn't understand the question, sorry.  Thank you for
13:52 19  clarifying.
13:52 20      Q   That's why we --
13:52 21      A   Yeah.
13:52 22      Q   We are here to work as a team --

Page 107

13:52  1      A   Thank you.
13:52  2      Q   -- so you can answer.
13:52  3      A   As far as attorney's fees, and doctors'
13:52  4  visits, and as far as like rent and stuff is
13:52  5  concerned, I mean just all kind of stuff.  Excuse me.
13:53  6  That's all I can think of right now.
13:53  7      Q   Did you provide to your attorney any
13:53  8  receipts or invoices from doctors' appointments that
13:53  9  would have been used to calculate financial loss?
13:53 10      A   Receipts?  They don't -- the doctor I go to,
13:53 11  if I use my card to pay, that's my receipt, my credit
13:53 12  card.  They have given me doctor's notes each time I
13:53 13  go for a visit, so I gave her those.  I gave her
13:53 14  receipts from my primary care physician.  I didn't
13:53 15  have the hospital one, but I know I didn't have
13:53 16  insurance then, so...
13:53 17      Q   We would request copies of any receipts, or
13:54 18  invoices, or bills that were used to calculate the
13:54 19  financial loss of $200,000.
13:54 20      A   Okay.
13:54 21          (Deposition Exhibit Number 10
13:54 22          was marked for identification.)

Page 108

13:54  1      Q   Going back again to Exhibit Number 5, I
13:54  2  would like you to go to page 7, interrogatory number
13:54  3  10.
13:55  4      A   Okay.
13:55  5      Q   In that response you identify nine
13:55  6  individuals who have provided statements to you.  Are
13:55  7  those written statements that you have received?
13:55  8      A   Some of them.
13:55  9      Q   Who have you received written statements
13:55 10  from?
13:55 11      A   Um, Captain Tate before I was terminated
13:55 12  wrote something in regards to being set up.  Nakisha
13:55 13  Hearst wrote something to me.  I think I might have
13:55 14  requested her to write, put something in writing based
13:55 15  on what she was alleging she had been told by one of
13:55 16  the supervisors who was conducting an investigation
13:55 17  regarding my case.  So she wrote a statement to me.
13:55 18  Rochelle Vaughan, Christopher Golson was a person who
13:56 19  made a verbal statement in the presence of Rochelle
13:56 20  Vaughan, so she witnessed it.  And the reason why
13:56 21  Sadie McCoy and Ashmeade Alfonzo are here, and -- oh,
13:56 22  and Barton, is because they were ones that, you know,

Page 109

13:56  1  wrote statements in regard to the 19th -- the incident
13:56  2  that occurred on the -- I think it was the 19th or
13:56  3  something.
13:56  4      Q   But they haven't provided you written
13:56  5  statements separate from those incident reports?
13:56  6      A   No. No.
13:56  7      Q   And you said that Christopher Golson made a
13:56  8  verbal statement in Rochelle Vaughan's presence?
13:56  9      A   Correct.
13:56 10      Q   And what did he say?
13:57 11      A   Okay.  Can I explain it to you?  Because it
13:57 12  is not -- I can't just say exactly what he said
13:57 13  without you understanding what was said first.  Okay,
13:57 14  prior to me being given a PSN for my wrongful
13:57 15  termination, Warden Douglas was harassing me, he
13:57 16  wrote -- he had or forced another employee Lavar
13:57 17  Matthews to write a bogus statement and -- after Lavar
13:57 18  Matthews had been terminated, and then my issue was
13:57 19  going on, they asked him to come back in, Christopher
13:57 20  Golson and Rochelle Vaughan to conduct an
13:57 21  investigation that we had requested, and they
13:57 22  interviewed him together, Rochelle Vaughan and

28 (Pages 106 to 109)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 110

13:57 1 Christopher Golson, and he made a statement that he
13:57 2 was pushed to write these things about me by Warden
13:57 3 Douglas. He didn't want to write them, but he was
13:57 4 forced to write them by Warden Douglas, he was given a
13:57 5 directive. And after he made that statement Chris --
13:57 6 and Rochelle Vaughan had already told Christopher
13:57 7 Golson prior to this meeting that my person that I am
13:57 8 representing told me that he was forced to write it,
13:57 9 write a statement, because they were alleging that --
13:58 10 well -- that he was forced to write statements that he
13:58 11 didn't really want to write and that were not true,
13:58 12 and Chris -- she said it to him prior to the meeting,
13:58 13 and then after talking to Lavar Matthews and he said
13:58 14 the exact same thing that I had told my Union -- my
13:58 15 Union rep and she had told Christopher Golson, he said
13:58 16 that sounds a lot like what you just told me that she
13:58 17 said. So he no longer -- he -- he no longer wanted to
13:58 18 even be involved in this. He was like I -- he
13:58 19 didn't -- the way my Union rep told me is that he was
13:58 20 like she -- she wasn't lying, she was telling the
13:58 21 truth, this man wrote it against her based on he was
13:58 22 forced to do it, and it was all lies, and I'm not --

Page 111

13:58 1 he don't even -- he don't want to be involved anymore.
13:58 2 He was like, you know -- he gave -- he went to the
13:58 3 Warden and I guess let the Warden know. I don't know
13:58 4 what happened after that, but, you know...
13:58 5    Q   And who is Christopher Golson?
13:58 6    A   He is no longer with the company, but he was
13:58 7 a Quality Assurance person I think. No, not -- well,
13:58 8 wait a minute, quality -- no. What was he? I think
13:59 9 maybe Quality Assurance. I think that's what --
13:58 10 Quality Assurance? Oh, I don't remember his title. I
13:59 11 don't even want to say Quality Assurance, that might
13:59 12 not be correct. Don't quote me on that.
13:59 13    Q   I would like you to take a look at what's
13:59 14 been marked as Jackson Exhibit Number 10.
13:59 15    A   Look through the whole packet, or is there
13:59 16 something specific?
13:59 17    Q   I need to ask you a question.
13:59 18    A   Oh, I --
13:59 19    Q   Just wait for me to ask you a question.
13:59 20    A   Well, no, I'm sorry, you were like look at
13:59 21 Exhibit 10.
13:59 22    Q   10, right. I was about to ask you --

Page 112

13:59 1    A   Oh, okay. I didn't -- okay, I didn't know
13:59 2 that -- okay.
13:59 3    Q   Do you recognize the documents that comprise
13:59 4 Exhibit Number 10?
13:59 5    A   Inclusive of all of them?
13:59 6    Q   Yes.
13:59 7    A   Okay. Oh, this is the one I was referring
14:00 8 to from Captain Tate. Okay, I believe that these are
14:00 9 I think statements regarding the incident from various
14:00 10 persons.
14:00 11    Q   That's what it appears to be to me, and I
14:00 12 just wanted to --
14:00 13    A   Okay.
14:00 14    Q   -- make sure that that's what it was.
14:00 15    A   Okay.
14:00 16    Q   Okay? Looking at the first document dated
14:00 17 December 7, 2005, which appears to be from Rochelle
14:00 18 Vaughan?
14:00 19    A   Uh-huh.
14:00 20    Q   Did you request that she prepare this
14:00 21 statement?
14:01 22    A   No, she -- I think this is -- can I read it?

Page 113

14:01 1 I don't even know what this is. I think -- I think
14:01 2 this is something that she wrote on her own, but let
14:01 3 me -- can I read it to see it?
14:01 4       Yeah, this is something that she wrote on
14:01 5 her own.
14:01 6    Q   Now, your employment with CCA terminated in
14:01 7 July of 2004?
14:01 8    A   Okay.
14:01 9    Q   Do you know why she would be writing this in
14:01 10 December of 2005?
14:01 11    A   Um, I think partly because, um, I was -- I'm
14:01 12 going -- prior to filing for the court, District Court
14:01 13 of Columbia to be involved, you have to exhaust your
14:01 14 administrative remedies as far as going to the Union.
14:01 15 So I asked for arbitration, and she is involved in
14:01 16 that, and she writes several documents on my behalf as
14:01 17 far as to CCA regarding the arbitration and their
14:01 18 denial to schedule a date for arbitration, which they
14:01 19 have done for the last like five years, also because I
14:01 20 had an unemployment hearing -- and I would have to
14:02 21 read it further to find out exactly, you know, like,
14:02 22 you know -- but that's probably the reason why, is

29 (Pages 110 to 113)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

---

Page 114

14:02  1    because the unemployment hearing and because of the
14:02  2    arbitration.
14:02  3        Q    To your knowledge was this letter sent to
14:02  4    CCA?
14:02  5        A    It was given to CCA at the unemployment
14:02  6    hearing as an exhibit. Like how these little stickers
14:02  7    are being used? We had to use those at the
14:02  8    unemployment hearing. And they had a copy of it, yes,
14:02  9    their attorney at the time, I think it may have been
14:02  10   like Gear, Ms. -- I don't know her last name, Greer or
14:02  11   Gear.
14:02  12       Q    Looking through what's been marked as
14:02  13   Exhibit Number 10, are there any statements in here
14:02  14   that you requested the witnesses to prepare for you?
14:03  15       A    Who is this from? There is one here from
14:03  16   Carolyn Walston. It was prepared because everybody
14:03  17   who I guess had something to do with the incident or
14:03  18   witnessed the incident or whatever. Let me see, on
14:03  19   May 14th, entered Personnel, okay, this one -- this --
14:03  20   I can't answer that question. I would have to go
14:03  21   through each individual document and specifically say
14:03  22   yes or no, yes or no, yes or no. If you want to do

---

Page 115

14:03  1    that, we can.
14:03  2        Q    That's what I am requesting that we do.
14:03  3        A    Okay. This one right here was requested to
14:03  4    be written I think by the Wardens because I was
14:03  5    writing an incident statement and grievance on an
14:03  6    employee being -- harassing me and being hostile
14:03  7    towards me.
14:03  8        Q    And I'm just requesting that you identify
14:03  9    any of the statements in Exhibit 10 that you
14:03  10   specifically requested that a witness prepare.
14:04  11       A    Well, I didn't ask anybody to prepare
14:04  12   anything. I think the Union requested persons to
14:04  13   prepare stuff.
14:04  14       Q    That's fine, if that's your --
14:04  15       A    Okay.
14:04  16       Q    Yes, that's fine.
14:04  17       A    Okay.
14:04  18       Q    And who is Carolyn Walston?
14:04  19       A    My mom.
14:04  20       Q    And who is Dana Bushrod?
14:04  21       A    An employee of CCA.
14:04  22       Q    Do you know if he is still employed there?

---

Page 116

14:04  1        A    It's a female.
14:04  2        Q    Do you know if she is still employed there?
14:04  3        A    I think she is.
14:04  4        Q    And the incident statement with the name of
14:04  5    Ashmeade, is that Alphonso Ashmeade --
14:04  6        A    Uh-huh.
14:04  7        Q    -- that you identified in your interrogatory
14:04  8    response?
14:04  9        A    It is.
14:04  10       Q    Remember, you have to let me finish asking
14:04  11   the question so the court reporter can get it down.
14:05  12       A    In this -- can I ask a question, or can I
14:05  13   say something, or how does that work? I just -- I
14:05  14   have never done this before, I don't know how that
14:05  15   works. I just want to know can I ask a question, can
14:05  16   I ask something of you or --
14:05  17           MS. WHITE:  No, she is supposed to ask the
14:05  18   questions.
14:05  19           THE WITNESS:  No, not ask her per -- I'm
14:05  20   talking --
14:05  21           MS. WHITE:  You want to have a break so you
14:05  22   can tell me what you are talking about?

---

Page 117

14:05  1            THE WITNESS:  I don't know if that's what I
14:05  2    am supposed to do or not. That's why I want to ask
14:05  3    the question.
14:05  4            MS. DAVIS:  If you need a break, you can ask
14:05  5    for a break.
14:05  6            THE WITNESS:  It's not for a break. It's
14:05  7    just that I think maybe there is a misunderstanding as
14:05  8    far as when you are actually finished, because I
14:05  9    thought you were finished making the question, like
14:05  10   because you said Alphonso, and you said Alphonso
14:05  11   Ashmeade in your statement, and then you had stopped,
14:05  12   and I thought you were finished. And I know you keep
14:05  13   saying the same thing, you have to let me ask the
14:05  14   question, and I'm like I am under the impression that
14:05  15   you are finished because you stop, and then you may
14:05  16   start again after our stopping. So I don't -- can we
14:06  17   signal some kind of way so that I will know when you
14:06  18   are really stopped or --
14:06  19   BY MS. DAVIS:
14:06  20       Q    Yes, I will let you know.
14:06  21       A    Okay.
14:06  22       Q    If I am finished and it doesn't appear that

---

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 118

14:06  1    you realize it, --
14:06  2        A    Okay.
14:06  3        Q    -- I will let you know.
14:06  4        A    Okay.
14:06  5        Q    If you will turn probably about 10 pages
14:06  6    into Exhibit Number 10, there is a handwritten note
14:06  7    that at the top it says "stay stable".
14:06  8        A    Yeah.
14:06  9        Q    Could you tell me who wrote that note?
14:06  10       A    Captain Tate.
14:06  11       Q    And could you tell me do you know what that
14:06  12   relates to?
14:06  13       A    She verbally told me that she felt like I
14:06  14   was being set up, and that she had heard somebody
14:06  15   talking about certain things and -- that morning
14:06  16   and -- oh, what date is on this?  And she -- after
14:06  17   saying -- making the verbal statement -- I hope it's
14:06  18   not the same day.  I don't remember -- I don't
14:07  19   remember specifically, but she wrote the statement and
14:07  20   later -- later -- she later on passed me something to
14:07  21   my hand.  Like you know how you verb -- someone
14:07  22   verbalizes something, and then she passed it to me in

Page 119

14:07  1    my hand.
14:07  2        Q    Do you still have the original of this note?
14:07  3        A    I don't know.
14:07  4        Q    Did you provide it to your attorney?
14:07  5        A    I don't know.  I don't know if I made a copy
14:07  6    or if I -- I -- I would have to research that.  I can
14:07  7    research that.  I don't know.
14:07  8        MS. DAVIS:  If you have the original of
14:07  9    this, we would like it, just because it's --
14:07  10       MS. WHITE:  She has it.
14:07  11       MS. DAVIS:  -- the copy is unclear.
14:07  12   BY MS. DAVIS:
14:07  13       Q    Three documents from the end of Exhibit
14:07  14   Number 10 is a letter dated August 6th, 2004.
14:07  15       A    From the end meaning --
14:07  16       Q    From the back of that same exhibit.
14:08  17       A    Okay.  August 6th?  Okay.
14:08  18       Q    August 6th, 2004.  And it's a letter from
14:08  19   Christopher Golson to Roosevelt Littlejohn.  Does this
14:08  20   relate to the meeting that you described to us earlier
14:08  21   where Rochelle Vaughan and Chris Golson were
14:08  22   present --

Page 120

14:08  1        A    Can I --
14:08  2        Q    -- and there was a discussion of Lavar
14:08  3    Matthews?
14:08  4        A    Can I read it to find --
14:08  5        Q    Do you need to read the document?
14:08  6        A    Yes, okay.
14:08  7        Q    If you need to read the document to refresh
14:08  8    your recollection, go right ahead.
14:08  9        A    Okay.
14:08  10           Hold on.  Wait a minute.  I am confused.
14:08  11   Wait a minute.  This is -- this is from -- who is this
14:08  12   from?  Oh, okay, from Christopher Golson, okay.
14:09  13           Yes.
14:09  14       Q    It does relate to --
14:09  15       A    It --
14:09  16       Q    -- that meeting?
14:09  17       A    It -- it re -- it re -- it relates to the
14:09  18   incident that occurred where I was put on I guess you
14:09  19   call it suspension and their meeting.  Do you
14:09  20   understand what I am saying?  Like because I was on
14:09  21   suspension.  By the Collective Bargaining Agreement
14:09  22   you only have 30 days to hand down a punishment and/or

Page 121

14:09  1    termination.  We asked for an extension because I let
14:09  2    them know my allegations in regard to the bogus
14:09  3    write-ups and, you know, all that other stuff.  So
14:09  4    that's why they did this one, in regard to their
14:09  5    meeting, their investigation, and the incident.  It
14:09  6    was like a lot that pertained to this.
14:09  7        MS. DAVIS:  Okay, it's now two o'clock, and
14:09  8    you indicated that you needed to leave because you
14:10  9    have daycare issues.  We will suspend the deposition
14:10  10   now and reschedule it at a date that your attorney and
14:10  11   I can agree to.
14:10  12       MS. WHITE:  You want to leave now or do
14:10  13   you --
14:10  14       THE WITNESS:  Can I take a break for a
14:10  15   minute first with my attorney before we suspend the
14:10  16   deposition?  Because I -- I would -- I would have to,
14:10  17   you know -- I don't understand the question.
14:10  18       MS. WHITE:  Okay.  We will take a break.
14:10  19       THE WITNESS:  I don't know what to -- I
14:10  20   thought it would be like done in a day.  That's why I
14:10  21   am asking.
14:10  22       MS. WHITE:  No, she said seven hours.

31 (Pages 118 to 121)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 122

14:10 1          THE WITNESS: Oh.
14:10 2          MS. WHITE: So since you've got to leave, we
14:10 3   can break it up.
14:10 4          THE WITNESS: Okay.
14:10 5          (Brief recess.)
14:11 6          MS. WHITE: We will suspend it.
14:11 7          I want to know -- okay, well, I guess you
14:11 8   and I will talk about the location, so -- I was
14:11 9   thinking perhaps maybe we can have it in my office in
14:11 10  our conference room.
14:11 11         MS. DAVIS: It will be here because I need
14:11 12  my documents. I need to be able to --
14:11 13         MS. WHITE: You can't bring your documents
14:11 14  to Largo?
14:11 15         MS. DAVIS: Well, I mean I'm not sure what I
14:11 16  will need. I don't want to have to cart --
14:11 17         MS. WHITE: Yes, I understand. I
14:11 18  understand. Okay.
14:11 19         MS. DAVIS: Okay.
14:11 20         MS. WHITE: Just give me a call. I am going
14:11 21  to be out up until Tuesday. I will be back in on
14:11 22  Tuesday evening.

Page 123

14:11 1          MS. DAVIS: And I will look at the calendar
14:11 2   just because I'm not sure what Judge Lamberth is doing
14:11 3   with this case --
14:11 4          MS. WHITE: I don't know what --
14:11 5          MS. DAVIS: -- because he extended
14:11 6   discovery, but the other deadlines weren't impacted.
14:11 7   So I have to take a look at it and see.
14:11 8          MS. WHITE: I don't know what he is doing
14:11 9   either, because he hasn't even granted my motion when
14:12 10  I asked to extend it to February 28th. So I'm going
14:12 11  on the assumption that he is going to extend it.
14:12 12         MS. DAVIS: That was granted.
14:12 13         MS. WHITE: I have never seen it.
14:12 14         MS. DAVIS: Would you like me to get a copy?
14:21 15         MS. WHITE: Yes, I have never seen it.
14:21 16         MS. DAVIS: We can go off the record now.
14:21 17         (Whereupon, there was a brief discussion off
14:21 18  the record.)
14:21 19         MS. DAVIS: January 25th at 9:00 we will
14:21 20  tentatively reschedule the deposition. In light of
14:21 21  some of the events today, we plan to videotape it.
14:22 22         MS. WHITE: I'm not going to allow my client

Page 124

14:22 1   to be videotaped.
14:22 2          MS. DAVIS: That's fine, we will file --
14:22 3          MS. WHITE: You will have to do a notice.
14:22 4          MS. DAVIS: That's fine, we will file --
14:22 5          MS. WHITE: Or file a motion or whatever.
14:22 6          MS. DAVIS: We will file a motion.
14:22 7          MS. WHITE: I don't see a point of you doing
14:22 8   a videotape.
14:22 9          THE WITNESS: In light of what? I don't
14:22 10  understand what that means.
14:22 11         MS. WHITE: I don't know what -- in light of
14:22 12  what. I don't know.
14:22 13         THE WITNESS: What does that mean?
14:22 14         MS. WHITE: I have no idea, but the bottom
14:22 15  line is that we don't have to take a -- we don't have
14:22 16  to do a video if we don't want to. And if she files a
14:22 17  motion, I will definitely object to it because there
14:22 18  is no reason for it.
14:22 19         THE WITNESS: Huh-uh.
14:22 20         MS. WHITE: And we are trying to provide you
14:22 21  with all the answers we can. Okay? Just because she
14:22 22  is not giving you the answers you want, that's no

Page 125

14:22 1   reason for you to tape it.
14:22 2          MS. DAVIS: No, she is giving me the answers
14:22 3   I want, believe me.
14:22 4          MS. WHITE: Okay, well, good. I don't know
14:22 5   why you think you need a videotape.
14:22 6          MS. DAVIS: I mean you accused me about my
14:22 7   tone. So if we have to go before the Judge, I just --
14:22 8          MS. WHITE: Yeah, your tone is really
14:23 9   rough --
14:23 10         MS. DAVIS: -- want to have a record.
14:23 11         MS. WHITE: In the beginning it was, it was.
14:23 12         MS. DAVIS: We can go off the record now.
14:23 13         (Whereupon, the deposition of RENITA
14:23 14  WALSTON-JACKSON was adjourned, scheduled to be
14:23 15  concluded on January 25th, 2008, at 9:00 a.m., in the
14:23 16  offices of Ford & Harrison, 1300 19th Street, N.W.,
14:23 17  Washington, D.C. 20036.)
18
19
20
21
22

32 (Pages 122 to 125)

Deposition of Renita Walston-Jackson - Volume 1
01/11/08

Page 126

| | | |
|---|---|---|
| 14:23 | 1 | DISTRICT OF COLUMBIA |
| 14:23 | 2 | I, Deborah L. Spear, a Notary Public for |
| 14:23 | 3 | the District of Columbia, do hereby certify that the |
| 14:23 | 4 | foregoing was reported by stenographic means, which |
| 14:23 | 5 | matter was held on the date and at the time and place |
| 14:23 | 6 | set out on the title page hereof, and that the |
| 14:23 | 7 | foregoing transcript constitutes a true and accurate |
| 14:23 | 8 | transcript of same to the best of my ability. |
| 14:23 | 9 | I further certify that I am not related |
| 14:23 | 10 | to any of the parties, nor am I an employee of or |
| 14:23 | 11 | related to any of the attorneys representing the |
| 14:23 | 12 | parties, and I have no financial interest in the |
| 14:23 | 13 | outcome of this matter. |
| 14:23 | 14 | GIVEN under my hand and seal this 16th |
| 14:23 | 15 | day of January 2008. |
| 14:23 | 16 | |
| 14:23 | 17 | |
| 14:23 | 18 | _____ |
| | | Deborah L. Spear |
| 14:23 | 19 | Notary Public |
| 14:23 | 20 | |
| 14:23 | 21 | My commission expires: |
| 14:23 | 22 | January 14, 2011 |

DEBORAH L. SPEAR, COURT REPORTER
(301)843-9370 / (301)641-0556