# Exhibit 8

Page 127

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
                                 :
RENITA S. WALSTON-JACKSON,       :
                                 :
              Plaintiff,         :
                                 :
  - vs -                         :     Civil Action
                                 :     NO.1:06-CV-616-RCL
                                 :
CCA OF TENNESSEE, INC.,          :
                                 :     VOLUME 2
              Defendant.         :
                                 :
- - - - - - - - - - - - - - - - x

                                       Washington, D.C.

                                       March 3, 2008

Continued Deposition of:

         RENITA S. WALSTON-JACKSON

a witness, was called for oral examination by counsel

for the Defendants, in the offices of Ford & Harrison,

1300 19th Street, Suite 700, Washington, D.C., 20036,

commencing at approximately 10:00:00 a.m., on Monday,

March 3, 2008, before Deborah L. Spear, a Notary

Public in and for the District of Columbia, when were

present on behalf of the respective parties:

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 3 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

2 (Pages 128 to 131)

Page 128

APPEARANCE OF COUNSEL
   On Behalf of the Plaintiff:
      L. SAUNDRA WHITE, ATTORNEY
      White Bay & Henderson, LLC
      1401 Mercantile Lane, Suite 200C
      Largo, MD 20774
      (240)455-6158
   On Behalf of the Defendant:
      ALISON N. DAVIS, ATTORNEY
      Ford & Harrison, LLP
      1300 19th Street, Suite 700
      Washington, D.C. 20036
      (202) 719-2000

VIDEOGRAPHER: Solomon A. Francis
      Legal Eye Media, LLC
      1302 High Street
      Culpepper, VA  22701
      (703) 842-7440

Page 129

C O N T E N T S

Witness                                    Page
RENITA S. WALSTON-JACKSON
    By Ms. Davis                            132

Jackson Deposition Exhibits           Marked
11   Job Description Acknowledgement    149
12   Administrative Clerk Job Description 150
13   Plaintiff's List of Borrowed Funds   152
14   Plaintiff's Financial Lost Calculations  158
15   Sick Certificate                     164
16   Employee Leave Authorization         165
17   Letter from Williams to Walston      167
18   3/7/03 letter to Walston from Williams  168
19   6/24/03 Riverside document           171
20   Exhibit B to Interrogatory &         173
     Document Requests

Page 130

1  PROCEEDINGS
2      VIDEOGRAPHER: Good morning. This begins
3  tape number one of the videotape deposition of
4  Ms. Renita Walston-Jackson taken in the matter of
5  Renita S. Walston-Jackson, Plaintiff, versus CCA of
6  Tennessee, Inc., Defendant, pending in the United
7  States District Court for the District of Columbia,
8  Case Number 1:06-CV-616-RCL. This deposition is being
9  held in the offices of Ford and Harrison, LLP, located
10 at 1300 19th Street, Northwest, Washington, D.C., on
11 March 3rd, 2008 at approximately 10:01 a.m.
12     My name is Solomon Francis from the firm of
13 Legal Eye Media, LLC, and I'm a Legal Video
14 Specialist. The Court Reporter is Deborah L. Spear
15 from Deborah L. Spear Reporting.
16     For the record will counsel please introduce
17 themselves and whom they represent.
18     MS. DAVIS: Alison N. Davis of Ford and
19 Harrison representing the defendant, CCA of Tennessee,
20 Inc.
21     MS. WHITE: L. Saundra White representing
22 the plaintiff, Renita Walston-Jackson.

Page 131

1      VIDEOGRAPHER: Will the court reporter
2  please swear or affirm the witness.
3  Whereupon,
4      RENITA S. WALSTON-JACKSON,
5  was called as a witness and, having first been duly
6  sworn by a Notary Public, was examined and testified
7  as follows:
8      VIDEOGRAPHER: You may proceed, counsel.
9      MS. DAVIS: Thank you.
10     Before we get started I just wanted to get
11 on the record the fact that prior to the commencement
12 of this deposition counsel had a conference call with
13 Judge Lamberth's chambers at which the issue regarding
14 whether or not medical records which have been
15 subpoenaed in this case may be used during this
16 deposition. The instructions of chambers, those
17 medical records will not be used during this
18 proceeding, but counsel for defendant is reserving the
19 right to file a motion, and if that motion is granted
20 which would allow counsel to use these documents, this
21 deposition will be reopened at a later date.
22     MS. WHITE: Oh, I have something I would

Case 1:06-cv-00616-RCL    Document 24-10    Filed 03/13/2008    Page 4 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

3 (Pages 132 to 135)

Page 132

1  like to put on the record. I would like to place on
2  the record that Counsel Alison Davis did not even
3  mention what the issue was with respect to the medical
4  records. That was never even told to the clerk, to
5  Judge Lamberth's court clerk. What Judge Lamberth's
6  clerk did say was that he was unavailable and that you
7  could go as far as you needed to and then file a -- an
8  order -- I mean a motion with the court, and that
9  included me and you filing motions, not just you
10 exclusively.
11       MS. DAVIS:  This is the second day of the
12 deposition of Renita Walston-Jackson. The first day
13 of the deposition was taken stenographically only, and
14 the time taken during that deposition was two hours
15 and 15 minutes according to the court reporter.
16     EXAMINATION BY COUNSEL FOR DEFENDANT (Resumed)
17 BY MS. DAVIS:
18   Q   Ms. Jackson, the last time we were here we
19 went over some of the what I call rules of the games
20 for your deposition. I'm sure you remember them, but
21 I just wanted to remind you of some key instructions
22 so that this deposition will go smoothly.

Page 133

1       First, it's best if you allow me to finish
2  asking my question before you start to answer. That
3  way the court reporter and the videographer can get my
4  question clearly on the record, and also they will be
5  able to get your answer fully. It's also important
6  that you allow me to finish asking my question, that
7  way you have time to think about the question, and if
8  you need it explained to you or clarified, we have
9  that opportunity before you answer. That way we know
10 that you understood the question when you answer it.
11      Is that okay?
12   A  That's fine.
13   Q  You started working for CCA of Tennessee on
14 August 19th, 2002; is that correct?
15   A  I don't recall the exact month. It was in
16 2002.
17   Q  And at the time that you started working at
18 CCA were you pregnant?
19   A  No.
20   Q  When did you learn that you were pregnant?
21   A  I don't recall the exact date. After being
22 employed for maybe about a -- I don't know, maybe

Page 134

1  about five, four or five months as I recall, I'm not
2  sure.
3    Q  And did you carry that pregnancy to full
4  term?
5    A  I just think that -- you all already have
6  that information. It's been given to you. I have
7  already given that information.
8    Q  Ms. Jackson, you need to answer my
9  questions.
10   A  No, no, I have. I have. I have already
11 answered the question.
12   Q  I asked did you carry to full term?
13   A  The pregnancy was not to full term. I had a
14 miscarriage, but you have already been provided that
15 information.
16   Q  And when did the miscarriage occur?
17   A  I don't remember the exact month, but you
18 have already been provided that information.
19   Q  At the time that you had the miscarriage did
20 you take time off from work?
21   A  I did.
22   Q  How much time did you take off?

Page 135

1    A  I don't recall.
2    Q  At the end of the time that you took off did
3  you return to work at CCA?
4    A  I -- I was being harassed to come back, so
5  yes, I did return.
6    Q  Did you return to the same position that you
7  were in previously?
8    A  For a short while, yes.
9    Q  Did you become pregnant a second time while
10 you were working at CCA?
11   A  No. Not that I recall, I mean...
12   Q  Now, you stated that you suffer from panic
13 attack syndrome?
14   A  I do.
15   Q  What is that?
16   A  It is an anxiety type of a disorder. It's
17 brought on without -- it's spontaneously brought on
18 based on stress.
19   Q  And what are the symptoms of panic attack
20 syndrome?
21   A  There are many different symptoms, and
22 everyone doesn't experience the same symptoms.

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 5 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

4 (Pages 136 to 139)

Page 136

1   However, for myself, sweating, heavy breathing,
2   disorientation, I have passed out, I have had
3   nosebleeds because of the hyperventilation.
4       Q   And when you suffer from panic attack
5   syndrome how long does it last?
6       A   Every one is different.
7       Q   How long did it last for you?
8       A   All of them are different, and I don't have
9   a -- I -- when you are having a panic attack, you
10  can't really watch a clock.
11      Q   Does it incapacitate you for more than one
12  day?
13      A   It could. It's completely and totally
14  exhausting.
15      Q   During the time that you were working for
16  CCA did you become incapacitated for more than one day
17  because of a panic attack?
18      A   While I was at work, yes. Actually I
19  suffered a panic attack in the building, and they
20  called a code because I passed out and fainted in the
21  Maintenance Department.
22      Q   Ms. Jackson, I ask that you answer the

Page 137

1   question I put to you. I asked if you ever were
2   incapacitated for more than one day because of a panic
3   attack while you were working at CCA?
4       A   I don't -- well, then I don't understand the
5   question. Can you rephrase it? I don't understand
6   what you mean.
7       Q   As a result of having a panic attack, did
8   you have -- were you unable to work for more than one
9   day?
10      A   Yes.
11      Q   When did that happen?
12      A   I don't recall the exact date.
13      Q   Did you see a doctor when you became
14  incapacitated?
15      A   Yes.
16      Q   Which doctor did you see?
17      A   Dr. Loya.
18      Q   Do you recall on how many occasions you were
19  incapacitated for more than one day?
20      A   I don't recall offhand.
21      Q   When you recovered from the panic attack,
22  did you return to work?

Page 138

1       A   I did, yes.
2       Q   Did you return to the position that you held
3   when you had the panic attack?
4       A   I don't recall. They -- they -- they --
5   because I was in a stressful environment and being
6   harassed, and I was in a hostile work environment,
7   eventually I wasn't able to work, and then I was into
8   another position. So I don't know which timeframe. I
9   don't recall the timeframe.
10      Q   Was there --
11      A   You know, for each panic attack, one panic
12  attack after another panic attack, but, however,
13  eventually I moved to another -- I was in another
14  position.
15      Q   Is there anything that would refresh your
16  recollection as to when you suffered these panic
17  attacks?
18      A   I wrote lots of statements, so if you have
19  any of those statements that I have given to you
20  through my counsel.
21      Q   When were you first diagnosed with panic
22  attack syndrome?

Page 139

1       A   I believe it was at the end of 2002.
2       Q   And do you still suffer from panic attack
3   syndrome?
4       A   Yes.
5       Q   When was the last time that you had a panic
6   attack?
7       A   This is 2008 now. I believe the last time I
8   have had one was in 2007, I believe.
9       Q   And what brought it on in 2007?
10      A   Stress from these proceedings.
11      Q   How did these proceedings bring it on?
12      A   When you reha -- when -- it's -- it's not at
13  rest. It's -- you are continuing to deal with it.
14  You have to continue to answer questions regarding it.
15  It brings up bad memories. It brings up bad thoughts.
16  I was in a very rough situation. I was in an
17  extremely hostile environment, and it was very scary
18  for me. So it brings a lot of stuff back up, lot of
19  fearful thoughts.
20      Q   Are you taking any medication for your panic
21  attack syndrome?
22      A   Because I'm not in that environment any

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 6 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

5 (Pages 140 to 143)

Page 140

1  longer and they are not, you know, consistent to a
2  point where they had me completely and totally unable
3  to work and maintain activities of daily living, no.
4     Q   Did you ever take any medication for panic
5  attack syndrome?
6     A   Yes.
7     Q   What did you take?
8     A   I don't recall the name of it. I think it
9  might have been -- I don't recall the name of it.
10    Q   Is there anything that would refresh your
11 recollection of what medication you have taken for
12 panic attack syndrome?
13    A   I don't recall the name of it.
14    Q   When was the last time you saw a health care
15 provider for your panic attack?
16    A   Um -- I don't recall the date. Uh -- I
17 don't recall the date.
18    Q   Was it within the last 12 months?
19    A   Well -- I don't recall the date. Um -- this
20 is 2008 now. So it's the beginning of the year.
21 Uh -- I don't recall the date.
22    Q   It was the beginning of 2008 that you saw a

Page 141

1  doctor --
2     A   No. What I am saying to you is that this is
3  beginning -- this is a new year. So I can only
4  account for 2007. So I don't recall a date.
5     Q   So you saw a health care provider in 2007
6  for your panic attack syndrome?
7     A   Regarding anxiety.
8     Q   And who did you see at that time?
9     A   My primary care physician.
10    Q   And who is that?
11    A   My primary care physician.
12    Q   And who is that?
13    A   Oh, you were writing, I wanted to wait.
14 Dr. Poydras.
15    Q   Dr. Poydras?
16    A   Uh-huh.
17    Q   Does Dr. Poydras have his or her own
18 practice?
19    A   I don't know what -- I don't know if it's
20 his or -- I don't know if it's her own. I believe so,
21 I don't know. I don't know if she has any other
22 partners or any other people that work in her office

Page 142

1  with her.
2     Q   Do you know what her address is?
3     A   I don't.
4     Q   Do you know where she is located?
5     A   Greenbelt.
6     Q   When did you start seeing Dr. Poydras for
7  panic attack syndrome?
8     A   That's personal, confidential information.
9  That's my primary care physician. It has nothing to
10 do with this case.
11    Q   Ms. Jackson, you are claiming that CCA of
12 Tennessee caused you to suffer from panic attack
13 syndrome and that it also exasperated, and you are
14 claiming damages related to that.
15    A   They did.
16    Q   We have the right to inquire about that to
17 gather information in order to respond to your claim.
18 Therefore, could you please tell me when you started
19 seeing Dr. Poydras?
20    A   Dr. Poydras is my primary care physician.
21 It does not pertain to CCA or this case.
22    Q   So she is not treating you for panic attack

Page 143

1  syndrome?
2     A   She is not a panic attack physician. I
3  didn't go to her just because of panic attacks. She
4  is my primary care physician, as I first stated to
5  you.
6     Q   My question for you is have you seen any
7  health care provider within the last 12 months for
8  panic attack syndrome?
9     A   If I have a panic attack, I will go to a
10 doctor to see them, and she is my primary care
11 physician.
12    Q   So you have seen Dr. Poydras for panic
13 attack syndrome?
14    A   For anxiety, panic attack syndrome.
15    Q   Are you married, Ms. Jackson?
16    A   I am.
17    Q   And what is your husband's name?
18    A   Reginald Jackson.
19    Q   And where is he employed?
20    A   Corrections Corporation.
21    Q   Does Mr. Jackson have health insurance
22 through CCA of Tennessee?

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 7 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

6 (Pages 144 to 147)

**Page 144**

1   A   He does.
2   Q   Are you on his health insurance?
3   A   I am.
4   Q   When were you placed on his health
5   insurance?
6   A   I don't recall the date.
7   Q   When did you get married?
8   A   2005.
9   Q   Do you remember what month?
10  A   I do, but that again is personal,
11  confidential information that has nothing to do with
12  this case.
13  Q   Could you please tell me the date on which
14  you got married?
15  A   It was in September.
16  Q   Of 2005? September of 2005?
17  A   I got married in 2005.
18  Q   Was it September of 2005?
19  A   It was.
20  Q   What was your position at CCA?
21  A   Pardon? I couldn't hear you.
22  Q   What was your position at CCA when you were

**Page 145**

1   hired?
2   A   Administrative Maintenance Clerk.
3   Q   Did you receive a job description when you
4   were hired?
5   A   I don't recall if they gave me a job
6   description. They gave me a chain of command form.
7   Q   And what did the chain of command show?
8   A   Just who my supervisors were.
9   Q   And who were you supervisors?
10  A   Jackie Smith and Warden Figueroa,
11  exclusively.
12  Q   Did there come a time when your chain of
13  command changed?
14  A   Not to my knowledge. Jackie Smith was no
15  longer my supervisor. However, when I moved from the
16  Maintenance Department I was never informed, you know,
17  other than it being Warden Douglas, that I had another
18  supervisor other than him.
19  Q   And when you moved from the Maintenance
20  Department where did you move to?
21  A   The Warden's level.
22  Q   What Department did you move to?

**Page 146**

1   A   Reservations.
2   Q   And what level of the facility was Jackie
3   Smith's office?
4   A   I'm sorry, I don't understand what you are
5   asking.
6   Q   On what level of the facility was Jackie
7   Smith's office located?
8   A   On the main level.
9   Q   Is that on the same level as the
10  Reservations?
11  A   No, it wasn't.
12  Q   What level is Reservations on?
13  A   On the Warden's level.
14  Q   Is that the second level, third level?
15  A   It's the second floor.
16  Q   After you moved from the Maintenance
17  Department to Reservations did you have a need to go
18  to Jackie Smith's office to do your job?
19  A   No, but Jackie Smith always came upstairs to
20  where I was.
21  Q   And how long was Warden Douglas your
22  supervisor?

**Page 147**

1   A   I'm not sure because he was terminated, so I
2   don't know -- I don't remember how long he was there.
3   Q   He was terminated before you were?
4   A   He was.
5   Q   Did you take any sick leave while you were
6   employed at CCA?
7   A   I did.
8   Q   Do you recall on how many occasions you took
9   sick leave?
10  A   Whenever I was under the stress -- distress
11  from work and began having panic attacks and had to
12  take off for work related stress. Sometimes my leave
13  wasn't granted, though.
14  Q   And what happened when your leave wasn't
15  granted?
16  A   I was denied leave. I wasn't allowed to
17  leave based on my illness they said, on several
18  occasions.
19  Q   All right. You testified that you can't
20  control when you have panic attacks?
21  A   You cannot.
22  Q   So you had requested to be able to leave

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

7 (Pages 148 to 151)

Page 148

1  whenever you had a panic attack?
2     A   If I had a panic attack, depending on the
3  severity of the panic attack, or the work related
4  stress because I was in a hostile work environment, I
5  have in previous -- in the past I mean, requested to
6  leave work based on those two circumstances, the work
7  related stress and/or the panic attacks, so I can go
8  see my treating physician.
9     Q   My question was did you want CCA to allow
10 you to leave whenever you had a panic attack?
11    A   CCA -- Warden Figueroa let me know, as well
12 as in the meeting with Warden Douglas with Rochelle
13 Vaughan, if I got sick from having this illness, I
14 would be able to leave work. However, after that I
15 was denied my leave.
16        MS. DAVIS: Counsel, I would ask you to
17 instruct your client to please answer my questions.
18 Otherwise we are going to be here all day.
19        THE WITNESS: I did answer.
20        MS. DAVIS: I asked a very direct question
21 if she wanted to be able to leave work when she had
22 panic attacks. That's a yes or no question.

Page 149

1         MS. WHITE: Okay. She answer -- she is
2  answering the questions to the best of her ability.
3         THE WITNESS: I said yes.
4         MS. WHITE: And you are stuck with her
5  answer, and we are not going to be here all day if you
6  continue to ask her duplicate questions.
7         MS. DAVIS: I am not asking -- I am just
8  trying to get her to answer the questions that are
9  ask -- that I am asking her. And so I will -- I will
10 continue --
11        MS. WHITE: I have instructed her to give
12 her -- to give you the best answer that she can give
13 you, and if that's the best answer she can give you,
14 then you are stuck with that answer.
15        MS. DAVIS: That's fine.
16        Have that marked, please.
17        (Deposition Exhibit Number 11
18        was marked for identification.)
19 BY MS. DAVIS:
20    Q   I'm showing you what's been marked as
21 Jackson Number 11. Is that your signature on that
22 document?

Page 150

1     A   I'm sorry, what -- I was reading this and
2  I'm looking at the -- I'm sorry, what was the question
3  again?
4     Q   I asked you if that was your signature on
5  that document.
6     A   It looks kind of different, but I mean it's
7  my name on here. It's my name on this document, but I
8  can't --
9     Q   But that's not your signature?
10    A   Well, I'm going to say this, it looks
11 different, the way that the -- it's written. So I
12 can't say for sure, but this is my name on the top of
13 the document. My name is on the top of this document.
14    Q   Okay.
15    A   In print my name is on the top of this
16 document. I don't --
17    Q   But you don't recognize the signature?
18    A   I don't recognize the signature.
19        MS. DAVIS: Okay. I will take the exhibit
20 back, please.
21        (Deposition Exhibit Number 12
22        was marked for identification.)

Page 151

1  BY MS. DAVIS:
2     Q   I'm showing you what has been marked as
3  Exhibit Number 12. It is a job description for
4  Administrative Clerk. Have you seen this document
5  before?
6     A   I don't recall. Let me look at -- let me --
7  I don't recall seeing this, but I was told by my
8  supervisor Jackie Smith what she wanted me to do when
9  I first --
10    Q   And was your job title Administrative Clerk
11 when you worked for CCA?
12    A   It was -- when I got hired I was considered
13 the Maintenance Secretary is what they told me.
14    Q   And at no time your title was Administrative
15 Clerk?
16    A   What I am saying is, is that when I was
17 first hired I was told my title was Adminis --
18 Maintenance Secretary, not Administrative Clerk, not
19 what they told me.
20    Q   Right. And you said when you --
21    A   Maintenance Secretary.
22    Q   Did there ever come a time that it changed

Case 1:06-cv-00616-RCL    Document 24-10    Filed 03/13/2008    Page 9 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

8 (Pages 152 to 155)

**Page 152**

1  that your title became Administrative Clerk?
2  A  Not to my knowledge.
3  Q  Okay, that's all I am asking.
4  A  Okay. Okay. Do I -- oh, okay.
5      COURT REPORTER: Just put them in the middle
6  in case you have to refer back to them.
7      THE WITNESS: Okay.
8      MS. DAVIS: Have that marked, please.
9          (Deposition Exhibit Number 13
10             was marked for Identification.)
11 BY MS. DAVIS:
12 Q  I'm showing you what's been marked as
13 Jackson Exhibit Number 13. Do you recognize that
14 document?
15 A  I do.
16 Q  And for the record, this Exhibit 1 was
17 attached to a Response to Request for Production that
18 defendant filed on plaintiff and received recently.
19 And Exhibit 1 is identified as Plaintiff's List of
20 Borrowed Funds. The first item is dated 2004 that you
21 borrowed $10,000 from your parents?
22 A  (Witness nodded head affirmatively.)

**Page 153**

1  Q  Could you tell me what that $10,000 was for?
2  A  Everything.
3  Q  What's everything?
4  A  Living, child care, my -- my chi --
5  everything, any -- any -- everything inclusive of
6  daily living, food, everything.
7  Q  And do you --
8  A  Clothes, everything.
9  Q  And do you remember in what part of the year
10 that you borrowed that money?
11 A  It was not all in one lump sum. It was on
12 different occasions, but that's how much it came out
13 to.
14 Q  Do you recall when you started borrowing
15 money from your parents?
16 A  I don't recall the date.
17 Q  And what is the basis for the $10,000
18 figure?
19 A  I don't understand that question.
20     MS. WHITE: I object to that. She has
21 asked -- you have asked her and she answered it.
22 BY MS. DAVIS:

**Page 154**

1  Q  Do you have any documents to support the
2  $10,000 figure?
3  A  It was not all given in one lump sum.
4  Q  I'm asking is there a document that shows
5  what that $10,000 was spent on?
6  A  Because my parents are not a party accompany
7  to this lawsuit, any monies that I got from them is
8  privileged and confidential information.
9  Q  The next item that you have is dated 2005
10 that you borrowed $5,000 from your uncle. Could you
11 please identify your uncle?
12 A  Because he is not a party to this lawsuit,
13 that is privileged and confidential information.
14 Q  In 2006 you borrowed $10,750 from your
15 parents. What was that money used for?
16 A  Everything.
17 Q  And what is everything?
18 A  Inclusive of the first answer that I gave
19 you, daily living.
20 Q  Do you recall when in 2006 you borrowed that
21 money?
22 A  I don't recall the date that it commenced.

**Page 155**

1  Q  Are there any documents to support the
2  $10,750?
3  A  Again, as I stated, no one on this list is a
4  party accompany to my lawsuit, and all of my
5  information is privileged and confidential.
6  Q  The next item is again in 2006 that you
7  borrowed $2,500 from your aunt. What was that money
8  used for?
9  A  Anything that I had to -- to use it for.
10 Q  Do you have any receipts showing that that
11 money -- what that money was spent on?
12 A  I don't generally keep like a bucket of
13 receipts, no, so...
14 Q  In 2006 from another -- from an aunt, is
15 that the same aunt you borrowed $500, or is that a
16 second aunt?
17 A  I have lots of aunts. However, again,
18 because no -- none of my family is a part of this
19 lawsuit, that is also privileged, confidential
20 information. Matter of fact this whole list is.
21 Q  And in 2007 you again borrowed $10,000 from
22 your parents. Any documents to support that number?

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

9 (Pages 156 to 159)

### Page 156

1  A   I'm sorry. I don't -- I don't -- again,
2  everything that I have borrowed from my family
3  members, because they are not a party to this lawsuit,
4  is privileged and confidential information.
5  Q   I'm not requesting specifically information
6  about your parents, but I am asking what the money was
7  spent on, if you have any documents --
8  A   Everything.
9  Q   Do you have any documents to show that it
10 was used to pay for child care expenses?
11 A   Everything that I had to do as far as daily
12 living, anything that I incurred is what it was used
13 for.
14 Q   And how do you know it was $10,000?
15 A   Because that's how much it was.
16 Q   And what is the basis for that?
17 A   Because I remember that's how much they gave
18 me.
19 Q   And from your uncle in 2007 you borrowed
20 $1,500, again, that's for everything?
21 A   It is.
22 Q   And in 2008 you borrowed $1,000 from your

### Page 157

1  aunt and uncle. Is this another set of aunts and
2  uncles different from the other aunts that you
3  borrowed from?
4  A   I have lots of family, again, like I stated,
5  who have had to help me based on being terminated from
6  CCA and placed in a hardship.
7  Q   But you have no documents to support the
8  amount that you borrowed from each of these
9  individuals?
10 A   I don't know what you mean when you say to
11 support.
12 Q   You said you spent it on everything, child
13 care, for living.
14 A   I never said child care. I don't recall
15 saying child care. However, my point to you is, is
16 that anything that I have had to incur in a daily
17 living is what I spent it on.
18 Q   And my question is did you save any receipts
19 relating to what you spent this money on?
20 A   I don't normally keep receipts. They stay
21 in the bag or wherever it is that they have been kept.
22     MS. DAVIS: Have that marked, please.

### Page 158

1       (Deposition Exhibit Number 14
2       was marked for identification.)
3  BY MS. DAVIS:
4  Q   During my prior questioning about Exhibit
5  Number 13 I also referred to it as Exhibit 1. That
6  Exhibit 1 refers to the document that it was attached
7  to, but it is actually Jackson Exhibit Number 13.
8  That's just to clear up the record.
9  A   Oh, okay.
10 Q   It's nothing for you to be concerned about.
11 A   Okay. Thank you.
12 Q   I'm showing you what has been marked as
13 Jackson Exhibit Number 14. I will represent that this
14 is Exhibit Number 2, again, to Plaintiff's Response to
15 Defendant's Request for Production of Documents. It's
16 titled Plaintiff's Financial Loss Calculation. And
17 according to this document the finan -- total
18 financial loss is $204,680. My question to you,
19 Ms. Jackson, is do you have any types of receipts, or
20 documents, invoices, bills to support the fair market
21 value that you have assessed for the items on this
22 document?

### Page 159

1  A   From what I recall, this is what I have
2  either paid or the amount of what it is that is
3  documented. Because everything was lost when my house
4  was evicted because I couldn't, you know -- that's why
5  I don't have any of my documents.
6  Q   Now, on here it says in 2004, family photos,
7  irreplaceable.
8  A   They are.
9  Q   How is CCA responsible for the loss of
10 family photos?
11 A   Because I requested to leave work that day
12 per Warden Douglas, and he refused to let me leave to
13 get my stuff.
14 Q   And on here there is again in 2004 paintings
15 and artwork of $580. How is CCA responsible for that
16 loss?
17 A   Again because I was refused to leave the
18 building, I asked -- I requested to leave the building
19 when I found out what was going on, and I was told I
20 could not leave.
21 Q   And what was going on?
22 A   My home was being evicted.

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 11 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

10 (Pages 160 to 163)

Page 160

1  Q  So all of these items on here that you claim
2  that you have lost related to your -- the eviction
3  from your home?
4  A  It -- they -- yes, it did.
5  Q  Were you ever employed at BT Health Care
6  Services?
7  A  I was.
8  Q  And what is BT Health Care Services?
9  A  It's a health care orientated position.
10 Q  And what did you do when you were employed
11 with BT Health Care Services?
12 A  Various things.
13 Q  Could you please --
14 A  Regarding health care.
15 Q  Could you tell me what your job duties were?
16 A  Phlebotomy, home care, a lot of things.
17 Q  Anything else?
18 A  I just answered the question.
19 Q  Were you a medical assistant, was that your
20 job, or were you a secretary?
21 A  Again, I answered the question, home care
22 phlebotomy, things of that nature.

Page 161

1  Q  So was the position a medical assistant type
2  of position?
3  A  It was a medical orientated position.
4  Q  And how long did you work for BT Health Care
5  Services?
6  A  Not that long.
7  Q  One month?
8  A  I don't recall.
9  Q  Two months?
10 A  I do not recall the timeframe.
11 Q  Do you recall how much you earned when you
12 worked for BT Health Care Services?
13 A  I don't -- you -- as far as what, earned
14 meaning?
15 Q  Do you recall --
16    MS. WHITE:  I am objecting to this line of
17 questioning relating to BT because Ms. Jackson has
18 never provided you with any information relating to
19 BT.
20    THE WITNESS:  Oh, yeah, I sure didn't.
21    MS. WHITE:  That is the information that you
22 illegally obtained from Kelly Services without her

Page 162

1  authorization.
2     THE WITNESS:  That is true.
3     MS. DAVIS:  I will reserve additional
4  questioning regarding BT Health Care Services pending
5  a motion that will be filed with Judge Lamberth.
6  BY MS. DAVIS:
7  Q  When you worked -- you previously testified
8  that you had worked for Kelly Services.  Do you recall
9  how much you earned when you worked for Kelly
10 Services?
11    MS. WHITE:  I'm objecting to that line of
12 questioning because that is information that you
13 obtained illegally.  You have the information.  You
14 have that -- that -- you have the information to
15 answer your own question.  And you obtained that
16 information without the authorization of Ms. Jackson.
17    THE WITNESS:  Exactly.
18    MS. DAVIS:  You just -- you don't want me to
19 use this information.  So I'm asking her if she can
20 please tell me how much she earned --
21    MS. WHITE:  She is not going to answer,
22 because you will in turn attempt to use that to

Page 163

1  impeach her testimony.  So I'm not even going to let
2  her -- allow her to open up the door with respect to
3  Kelly Services.
4     MS. DAVIS:  Again I will reserve the right
5  to reopen questioning regarding Kelly Services pending
6  a resolution of a motion to be filed with Judge
7  Lamberth.
8  BY MS. DAVIS:
9  Q  Ms. Jackson, have you spoken to anybody
10 other than your attorney about this case?
11 A  I don't understand that question.  What do
12 you mean?
13 Q  Other than conferences or telephone calls
14 that you have had with Attorney White, have you talked
15 about this case --
16 A  Not that I can recall.
17 Q  You haven't spoken to your husband about
18 this case?
19 A  That's privileged and confidential
20 information.  I don't think I should have to ask any
21 questions pertaining to my marriage, which is private.
22 Q  Have you spoken to your mother about this

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 12 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

11 (Pages 164 to 167)

Page 164

1  case?
2      A   No. Again, that is not something that I --
3  I -- my personal business is my own.
4      Q   Do you recall being absent from work in May
5  of 2004?
6      A   I don't recall the dates that I was absent,
7  but I was absent on several occasions from work.
8              (Deposition Exhibit Number 15
9              was marked for identification.)
10 BY MS. DAVIS:
11     Q   Have you had a chance to look at Jackson
12 Exhibit 15?
13     A   I did.
14     Q   Does this refresh your recollection about
15 being absent from work on about May 3rd, 2004?
16     A   It says I was, so I was absent, or whatever,
17 I went to see the doctor. I don't know if this says I
18 was absent. I don't -- I mean, you know, it says may
19 return -- okay, so, yeah, I was off.
20     Q   And why were you off?
21     A   Work related stress --
22     Q   And do you --

Page 165

1      A   -- is what it says.
2      Q   Do you recall what caused that stress?
3      A   I was under a con -- a hostile work
4  environment. I was being harassed at work. I don't
5  recall the exact incident that triggered this specific
6  doctor visit, but that's what it was.
7              (Deposition Exhibit Number 16
8              was marked for identification.)
9          MS. DAVIS:  I'm showing you what's been
10 marked --
11         MS. WHITE:  Oh -- oh -- I would like to --
12         MS. DAVIS:  -- as Jackson Exhibit Number 16.
13         MS. WHITE:  Excuse me. Excuse me. I would
14 like to talk with my client for a moment, please.
15         VIDEOGRAPHER:  The time is 10:37 a.m. We
16 are going off the record.
17         (Brief recess.)
18         VIDEOGRAPHER:  The time is 10:38 a.m. We
19 are back on the record.
20 BY MS. DAVIS:
21     Q   Before we took a break we were looking at
22 Jackson Exhibit Number 16. It's an Employee Leave

Page 166

1  Authorization. Do you recall requesting time off on
2  May 3rd or May 5th, 2004?
3      A   I'm sorry. Oh, okay. May 3rd and 5th I
4  believe were sick and personal hours, and then
5  holiday. I do.
6      Q   And did --
7      A   I wasn't granted the time off. I was
8  denied.
9      Q   You didn't receive that time off?
10     A   Warden Douglas told me I couldn't have it.
11 Even though I was entitled to a float holiday, which
12 every employee, by the way, is entitled to every year,
13 he still denied me my time off. And personal and sick
14 leave, because I was off I believe to my -- what I can
15 recall, because I was off due to the work related
16 stress, I had to put in time so that I could get paid,
17 you know, for how much sick leave that I did have, I
18 had to put in time, and he refused to give me my -- my
19 pay.
20     Q   And looking again at Jackson Exhibit Number
21 16, that signature, do you know whose signature that
22 is?

Page 167

1      A   That's mine.
2      Q   That's your signature at the bottom?
3      A   It is.
4          MS. WHITE:  Are you giving me this?
5          MS. DAVIS:  Right here.
6          MS. WHITE:  Can you throw it a little
7  further?
8              (Deposition Exhibit Number 17
9              was marked for identification.)
10 BY MS. DAVIS:
11     Q   I'm showing you what's been marked as
12 Jackson Exhibit Number 17. Do you recognize this
13 document?
14     A   Um, not offhand I don't recognize it, but I
15 know that eventually I started receiving something
16 similar to this, so possibly.
17     Q   Were you granted FMLA leave at any time
18 while you were employed with CCA?
19     A   Yeah, as a tem -- on a temporary basis.
20     Q   What do you mean on a temporary basis?
21     A   I requested medical leave under FMLA. I was
22 eligible for leave under FMLA. So they granted me the

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 13 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

12 (Pages 168 to 171)

Page 168

1  leave. They also asked me to send in medical
2  documentation I guess supporting the FMLA. I did, and
3  they tried to claim that I didn't, and that's why
4  while I was off I was like being harassed to come back
5  to work, receiving calls daily, receiving letters in
6  the mail, after supplying medical documentation.
7     Q  And you were terminated from employment with
8  CCA, correct?
9     A  Pardon?
10    Q  You were terminated from employment with
11 CCA?
12    A  I was wrongfully terminated, yes.
13    Q  Were you terminated for poor attendance?
14    A  No, I wasn't terminated for poor attendance.
15 Any time I was off it was because of medical related
16 issue.
17    Q  And when you took time off for medical
18 issues, you were able to come back to work at CCA?
19    A  When the doctor released me from care I did.
20           (Deposition Exhibit Number 18
21            was marked for identification.)
22 BY MS. DAVIS:

Page 169

1     Q  I'm showing you what has been marked as
2  Jackson Exhibit Number 18. Do you recognize that
3  document?
4     A  Actually I don't. I don't recall ever
5  seeing this document.
6     Q  Do you recall being absent from work at CCA
7  starting February 26th, 2003?
8     A  I'm sorry, say that again. I was reading.
9  You didn't give me a chance to read it. You know, I
10 wanted to read it fully.
11    Q  Do you recall being absent from work
12 starting on February 26th, 2003?
13    A  I don't recall the dates.
14    Q  Do you recall having a car accident in
15 February of 2003?
16    A  I don't recall the date.
17    Q  Did you have a car accident in 2003?
18    A  I believe I did in 2003, however, I don't --
19 I don't remember the date.
20    Q  And were you absent from work as a result of
21 the car accident?
22    A  Possibly.

Page 170

1     Q  Did you request FMLA leave when you were
2  absent from work because of an automobile accident?
3     A  I'm sorry, say it again.
4     Q  Did you request FMLA leave from CCA when you
5  had a car accident in 2003?
6     A  Well, I -- from what I can recall I had more
7  than one car accident. So which one are you referring
8  to?
9     Q  For any car accident in 2003 did you request
10 FMLA leave?
11    A  Possibly, to what I recall.
12    Q  Do you recall if you were granted FMLA leave
13 in 2003?
14    A  Again, as stated with this document, I
15 recall being granted FMLA. I don't remember the
16 particular issue that sent me out on FMLA because I
17 was under so much stress, I don't recall whether it
18 was work related stress or whether it was a car
19 accident, I don't remember which issue it was. But I
20 was granted FMLA, and then I supplied medical
21 documentation supporting the absence, and they alleged
22 they didn't have it, and then came back and said, oh,

Page 171

1  we have it, and everything was quashed, fine.
2     Q  So you recall receiving FMLA leave in 2003
3  then?
4     A  If -- if -- yeah, okay, well, 2003. I mean
5  I didn't stay off on it, but I was -- I was granted it
6  initially I should say.
7        MS. WHITE: I'm going to object to the
8  admission of this document by -- what exhibit is that?
9        THE WITNESS: Yeah, I have never seen this
10 before.
11       MS. WHITE: Okay. Exhibit Number 18,
12 because there is no foundation, and we have never
13 gotten any information from Rhonda Williams, and we
14 also requested her deposition, in which she is in
15 contempt of failing to obey the subpoena request.
16       MS. DAVIS: Your objection is noted.
17          (Deposition Exhibit Number 19
18           was marked for identification.)
19 BY MS. DAVIS:
20    Q  I'm showing you what's been marked as
21 Jackson Exhibit Number 19. Do you recognize this
22 document?

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

13 (Pages 172 to 175)

Page 172

1  A   I do.
2  Q   And what is it?
3  A   Well, hold on. Wait a minute. What is
4  this? I don't think I provided this document to you.
5  I don't recall even giving authorization for you to
6  have this document.
7  Q   I will represent that this document, and I
8  can get you the Bates number, is a doctor's note that
9  was included in your personnel file that CCA received
10 from you on or about June of 2003.
11 A   If it was, like I said, I don't recall
12 giving this to you, though. I don't recall giving it.
13     MS. WHITE: Also I don't recall you
14 giving -- providing this to us.
15     MS. DAVIS: I will get --
16     THE WITNESS: I don't recall it coming to us
17 either.
18     MS. DAVIS: I will give you the Bates number
19 because we did provide this to you.
20     THE WITNESS: Oh, no, that's no problem, if
21 they can, I don't -- I just don't recall.
22 BY MS. DAVIS:

Page 173

1  Q   And it notes difficulty sleep and stress.
2  Do you recall seeing a physician at Riverside Primary
3  Care for that condition in June of 2003?
4  A   I saw physicians at Riverside Primary Care
5  for lots of work related stress reasons. However, the
6  information obtained from River Prime -- Riverside
7  Primary Care is personal and confidential. I never
8  authorized the release of any of it. So I don't
9  recall giving this document. If you say I did, okay
10 then, you can show me, but I don't recall giving this
11 document to you.
12     MS. DAVIS: May I have that marked, please?
13     COURT REPORTER: Number 20.
14         (Deposition Exhibit Number 20
15         was marked for identification.)
16 BY MS. DAVIS:
17 Q   I will give you the opportunity to look at
18 what has been marked as Jackson Exhibit Number 20.
19 A   Okay.
20 Q   Do you recognize what's been marked as
21 Jackson Exhibit Number 20?
22 A   I'm sorry, what did you mean?

Page 174

1  Q   Do you recognize what has been marked as
2  Jackson Exhibit Number 20?
3  A   I recognize some of the documents in it.
4  Q   I will represent to you that Exhibit B, as
5  Jackson Exhibit Number 20 is also marked, is Exhibit B
6  to your interrogatory and document responses that were
7  provided to CCA of Tennessee. And if you will turn in
8  probably about halfway through, you will see a
9  doctor's note from Riverside Primary Care, District
10 Heights, dated June 24th, 2003.
11 A   I see it. Again, like I said, I don't
12 recall ever giving this document to you. As a matter
13 of fact, I see another document in here that I don't
14 remember giving.
15 Q   Well, these -- these documents all came from
16 your attorney --
17 A   Okay.
18 Q   -- attached to your discovery responses.
19     MS. WHITE: I'm going to object to the
20 admission of these documents on the record because
21 some of these documents I am certain that we did not
22 provide to you. These documents, especially some of

Page 175

1  them relating -- coming from Prince George's Hospital,
2  and especially the one relating to Worker's
3  Compensation that was done on -- let's see.
4      THE WITNESS: Which one?
5      MS. WHITE: I saw something on one of them.
6      THE WITNESS: Regarding what?
7      MS. WHITE: Accident and disability claim.
8      MS. DAVIS: So, counsel, you are objecting
9  to the documents that you provided to us?
10     MS. WHITE: I did not provide you with this
11 document. We have copies of everything we provided
12 with you. These documents was included in the illegal
13 documents you received from your illegal subpoena that
14 you represented yourself --
15     THE WITNESS: Right, some of these -- some
16 of these --
17     MS. WHITE: Excuse me, Renita.
18     THE WITNESS: Oh, I'm sorry. I'm just
19 reading --
20     MS. WHITE: On January 22nd you
21 misrepresented yourself under 4-306, the Maryland
22 Statute, that you were a law enforcement and you were

Case 1:06-cv-00616-RCL   Document 24-10   Filed 03/13/2008   Page 15 of 15

Deposition of RENITA WALSTON-JACKSON
03/03/08 - Walston-Jackson vs. CCA of Tenn.

14 (Pages 176 to 178)

Page 176

1  entitled to these documents, and which you were not.
2  So we are objecting to any of these documents of which
3  we did not provide to you, and I will review these
4  documents and make sure that none of this was actually
5  included in my request to you, and I'm sure that they
6  were not, but we will get back to you.
7       MS. DAVIS: Could you tell me what time it
8  is? Okay. What time is it?
9       VIDEOGRAPHER: 10:50.
10      THE WITNESS: But like I don't -- I don't
11 recall that one either, but some of them yes, but some
12 of them no.
13      MS. DAVIS: The time is now 10:50, and I am
14 discontinuing the deposition at this point, and I
15 intend to file a motion with the court to compel
16 Ms. Jackson to respond to further questions relating
17 to her mitigation of damages and her claimed emotional
18 distress and other damages in this case relating to
19 documents that were subpoenaed from Riverside Primary
20 Care, Metropolitan Orthopedic, Kelly Services, as well
21 as other health care providers.
22      MS. WHITE: And I will also provide a

Page 177

1  response to any motion that you prepare.
2       VIDEOGRAPHER: The time is 10:51 a.m. This
3  concludes today's videotape proceedings of Ms. Renita
4  Walston Jackson.
5       (Whereupon, the deposition of RENITA S.
6  WALSTON-JACKSON was adjourned.)

Page 178

1  DISTRICT OF COLUMBIA
2       I, Deborah L. Spear, a Notary Public for
3  the District of Columbia, do hereby certify that the
4  foregoing was reported by stenographic means, which
5  matter was held on the date and at the time and place
6  set out on the title page hereof, and that the
7  foregoing transcript constitutes a true and accurate
8  transcript of same to the best of my ability.
9       I further certify that I am not related
10 to any of the parties, nor am I an employee of or
11 related to any of the attorneys representing the
12 parties, and I have no financial interest in the
13 outcome of this matter.
14      GIVEN under my hand and seal this 3rd
15 day of March 2008.
16
17
18              _____
                 Deborah L. Spear
19               Notary Public
20
21 My commission expires:
22 January 14, 2011